MATTER OF M/V SIGNEBORG

In FINE Proceedings

CHI-10/4.6
MIL-10/4.2

*Decided by Board July 7, 1960*

Fine—Section 254(a)—Failure to detain on board—Multiple violations by same crewman incur single fine.

Maximum penalty under section 254(a) of 1952 Act for failure to detain crewman on board vessel in course of single trip to this country is $1,000 for each such crewman despite successive violations at ports of call in United States.

IN RE: M/V *SIGNEBORG* which arrived at the ports of Chicago and Milwaukee from foreign, via other United States ports, on August 21 and 27, 1959, respectively. Alien crewmen involved: G—D—R— and J—S—E—.

BASIS FOR FINE: Act of 1952—Section 254 (8 U.S.C. 1284).

**BEFORE THE BOARD**

**DISCUSSION:** The District Director at Chicago, finding no mitigation justified, ordered penalties totaling $3,000, imposed on the Great Lakes Overseas, Inc., and the General Steamship Agencies, Inc., agents for the vessel at the respective ports involved, as follows: $1,000 for failure to detain R— aboard the vessel at Chicago; and $2,000 ($1,000 as to each) for failure to detain R— and E— aboard at Milwaukee; and all pursuant to an order to do so. On February 24, 1960, this Board ruled that the penalty of $1,000 for failure to detain R— aboard at Milwaukee was improperly imposed; we mitigated the remaining fines to the extent of $200 in the case of each crewman; and we permitted a total penalty of $1,600 ($800 as to each crewman) to stand. The matter is again before us by way of a Service motion requesting reinstatement of the District Director's order, and urging error in our elimination of one of the fines as to R—, as well as in the reduction of the remaining penalties as to both the crewmen. The motion will be denied.

The basic facts of the matter, which are established and unquestioned, require only brief recitation here since they have been adequately discussed in our prior opinion and in the motion filed by the

6

Service. Both these crewmen were issued conditional landing permits at Cleveland, where the vessel made its first United States port call. Their landing permits were later cancelled and detention notices executed as to them were served on the master(s). The crewmen subsequently escaped from the vessel at the ports indicated; they were thereafter captured and placed back aboard; and ultimately, at Detroit, the master refused to take them back aboard and the Service had to keep them in custody. The final disposition of their cases is not reflected in this record.

Section 254(a) provides that:

> The . . . agent . . . of any vessel . . . arriving in the United States from any place outside thereof who fails . . . (2) to detain any alien crewman on board the vessel . . . after such [immigration] inspection unless a conditional permit to land temporarily has been granted such alien crewman . . . shall pay . . . *the sum of $1,000 for each alien crewman in respect of whom any such failure occurs.* . . . (Emphasis supplied.)

The issue is whether the foregoing language can properly be construed to support the imposition of a fine of $1,000 each and every time any one alien crewman who has been refused a conditional landing permit leaves his vessel between the time of its first United States port call and its next subsequent foreign sailing. The point has not previously been presented in this light, despite the fact that this statute has been on the books in substantially the same form since 1924.[1]

There is no question but that the purpose of this legislation is to provide close control over crewmen, and to place the burden thereof upon carriers rather than the government; that this section of the law should be construed in connection with every other part or section of the 1952 Act so as to produce a harmonious whole; and that where the meaning of the wording is doubtful, the purpose of the Congress, as well as the evils intended to be remedied, may be considered.[2] However, there are other applicable and well-recognized rules of statutory construction which preclude reaching the result sought by the Service, even though it might be most desirable from a practical standpoint.

The key words here are, for the most part, ordinary and must be given their usual and commonplace meaning.[3] The statute must be strictly construed in all respects because of its quasi-penal nature.[4] As a matter of law, carriers must be favored in its construction.[5] In other words, the language of the law cannot be enlarged beyond the

---

[1] Section 20(a), Act of May 26, 1924; former 8 U.S.C. 167.

[2] *United States* v. *National Surety Co.*, 20 F.2d 972.

[3] *Auers* v. *Phillips Petroleum Co.*, 25 F. Supp. 458; *Shultz* v. *Morgan*, 42 P. 254.

[4] *Miller* v. *Robertson*, 266 U.S. 243.

[5] *United States* v. *J. H. Winchester & Co.*, 40 F.2d 472.

7

ordinary meaning of its terms in order to carry into effect the general purpose for which it was enacted.[6]

Applying the foregoing rules here, we conclude that the words *"the sum of $1,000 for each alien crewman in respect of whom any such failure occurs,"* cannot properly and reasonably be interpreted as if they read "for each violation by an alien crewman," as urged by the Service. We think the decisive words are *"each alien crewman."* Appearing in juxtaposition to them, the words "the sum of $1,000" limit the total penalty that can be imposed as to any one crewman to that specified figure. This is particularly true since both phrases are restricted by the use of the singular word "failure."

Actually, by using the words "for each alien crewman in respect of whom any such failure occurs," the Congress meant nothing more than that a separate penalty should be assessed for each crewman who is not detained, as opposed to creating a single violation of the statute per vessel, no mater how many detained crewmen might escape from it.[7] While there are no precedents on this point, because of its general acceptance and recognition, we have found several unreported cases, including one under the 1924 Act (the first, *infra*), wherein the Service has consistently interpreted this section to justify the imposition of only one fine as to each crewman, regardless of the number of times he went ashore during any one trip of a vessel to the United States, as follows:

*SS. "Orete" — F-0503/76, B.I.A., May 28, 1953.* Notice to Detain on Board was served on master and agents. Three days later the crewman left the ship and went to the Cuban consulate to get his passport revalidated. He thereafter returned to the vessel, but subsequently deserted.

*M/S "Rita" — F-0608/124, B.I.A., April 14, 1954.* Two crewmen were granted conditional landing permits at Mobile, Ala., the vessel's first port of call in the United States. It thereafter proceeded coastwise to Tampa, Fla., where their landing permits were revoked and Detain on Board notices served. This occurred on September 22, 1953.

One of the crewmen was questioned by a Service officer on November 10, 1953. He stated that he had gone ashore every night; that he had married on October 17, 1953; and that he spent every night ashore with his wife. He sailed foreign with the vessel on November 25, 1953.

The other crewman was questioned by a Service officer on November 11, 1953. He stated that he had been ashore twice that day, both in the a.m. and p.m., for food and coffee; and that he had been ashore each day the ship was in port. He eventually deserted.

*O/S "Sun Star" — F-1007-38 & 39, B.I.A., July 29, 1955.* Three crewmen were refused conditional landing permits but went ashore on one or two occasions thereafter during a considerable period of time the vessel was in San Diego.

*Brig "Madalan" — PRO-10/11.1 & 11.2, B.I.A., May 16, 1957.* Thirteen crewmen were refused conditional landing permits on arrival but later went ashore.

---

[6] *In re McDonough,* 49 Fed. 360.

[7] See *Grant Bros. Construction Co.* v. *United States,* 232 U.S. 647.

At least three of them were ashore on two separate occasions, about three weeks apart, when Service officers checked the vessel.

*M/S "Maureen" — NOL–10/61.43, B.I.A., December 11, 1957.* The crewman was ordered detained on board at Houston, but was later jailed at Gulfport, Miss., and was not aboard when the vessel sailed coastwise. However, the responsible parties obtained his release and put him back aboard at Panama City, Florida. He later deserted at that port.

*SS. "Dorion" — NOR–62, B.I.A., June 25, 1958.* The crewman was granted a D–1 conditional landing permit which was later revoked. He was then placed back aboard the vessel and the master was ordered to detain him on board. The crewman subsequently escaped, and was recaptured through the efforts of the agents. He thereafter again escaped.

*S/T "Sea Thunder" — BAL–10/1.62, B.I.A., September 23, 1958.* Crewman was refused a conditional landing permit on arrival. Five days later the master let him go to Washington, D. C., to obtain a passport. He came back aboard the same day, but about a month later deserted.

As a matter of fact, the principle has been recognized internally in this case since, after the foregoing charged violations, both of these crewmen left the vessel at Detroit, were captured and taken back aboard by immigration officers; the master refused to accept them and the Service had to keep them in custody but no fines were ordered imposed by the District Director for these violations.

This construction of the statute by the executive branch of the government charged with its enforcement gives weight to its interpretation, especially since it is of long standing.[8] Particularly after 36 years, and absent any substantial change in the phraseology of the law, we are of the opinion that there is no legal or logical basis for the position presently taken by the Service.

Support for the foregoing, which is unnecessary, is provided in section 254(b) of the Immigration and Nationality Act, which reads:

Except as may be otherwise prescribed by regulations issued by the Attorney General, proof that an alien crewman did not appear upon the outgoing manifest of the vessel or aircraft on which he arrived in the United States from any place outside thereof, or that he was reported by the master or command-ing officer of such vessel or aircraft as a deserter, shall be *prima facie* evi-dence of a failure to detain or deport such alien crewman.

This language indicates that the question of whether or not there has been a violation of the law is determined as of the time a vessel on which the crewman arrived sailed foreign. Its reasonable interpretation is that, as to subsection (a), there can only be one violation as to one alien crewman in the course of one trip of a vessel to the United States. We so hold.

The Service argues that such a holding will enable carriers to disregard the law with immunity. Its theory is that, after a detainee escapes from his vessel once, they need do nothing to bring about his apprehension and deportation because their liability has already

---

[8] *Lloyd Royal Belge Societe Annonyme v. Elting,* 61 F.2d 745; and *Costanzo v. Tillinghast,* 287 U.S. 341.

been determined and their fine cannot be increased. This, however, overlooks the point that, in the statutory scheme, efforts on the part of carriers after the escape, to the end that the escapee's apprehension and deportation may be effected, can and do result in substantial reduction in the amount of the penalty permitted to stand either by the district director or this Board. Our experience is that this factor has been most effective in obtaining the cooperation of carriers operating into coastal ports of the United States. We see no reason to believe it will not have the same effect on carriers operating along the St. Lawrence Seaway and the Great Lakes, where the novelty of the operation has confronted them with difficulties proportionate to the enforcement problems encountered by the Service in that area. But in any event, this matter of mitigation is the only answer to the problem under the law as written. Mere convenience of enforcement cannot justify a strained construction of the statute.[9]

It also may well be, as the Service contends, that such a ruling will place carriers in a better position where one crewman leaves his vessel several times than in a situation where a number of crewmen equivalent thereto leave only once. The answer, again, lies in the framework of the law which we must interpret as it stands and are powerless to change. There was nothing to hinder the Congress from making each consequence, *i.e.*, each violation by a crewmen, a separate offense, but by its proper construction this section of the law does not do so.[10]

This question of mitigation now brings us to the secondary issue raised by the Service, to wit, justification for the mitigation previously authorized by this Board. We still are of the opinion that such action was warranted for the reasons stated in our opinion, which need no repetition here. In addition, however, we will point out that as the Service has encountered problems of enforcement along the Great Lakes and the St. Lawrence Seaway, so too have the carriers been confronted with difficulties not easy of solution. Due to the novelty of the operation along this waterway, and the unexpected problems presented to the responsible parties, the precautions normally taken by agents, owners and others at established coastal ports are either unknown or unavailable. We think that these factors can and should properly be considered, particularly since the record establishes that they contributed to the detention problems here.

**ORDER:** It is ordered that the motion be and the same is hereby denied.

---

[9] *United States* v. *J. H. Winchester & Co.*, 40 F.2d 472.

[10] See *Missouri, Kansas & Texas Railway Co. of Texas* v. *United States*, 231 U.S. 112.