Juan Radhames Pena MONTERO,
Petitioner,

v.

Charles T. COBB, in his official capacity as District Director, Boston Office Immigration and Naturalization Service; Janet Reno, in her capacity as Director of the Department of Justice of the United States of America; and any other persons having the Petitioner in custody, Respondents.

Civil Action No.: 96–11449–WGY.

United States District Court,
D. Massachusetts.

Aug. 28, 1996.

Lenore Glaser, Stern, Shapiro, Weissberg & Garin, Boston, MA, for Juan Radhames Pena Montero.

Frank Crowley, Immigration & Naturalization Special Assistant U.S. Attorney, Boston, MA, Pauline Terrelonge, United States Department of Justice, Office of Immigration Litigation, Washington, DC, for Charles T. Cobb.

Pauline Terrelonge, United States Department of Justice, Office of Immigration Litigation, Washington, DC, for Janet Reno.

### MEMORANDUM OF DECISION

YOUNG, District Judge.

### I. Introduction

Petitioner Juan Radhames Pena Montero ("Montero") has filed this habeas corpus action against Charles T. Cobb, District Director of the Boston Office of the Immigration and Naturalization Service (the "Service"); Janet Reno, Attorney General of the United States; and any other persons having Montero in custody (collectively, the "Respondents"). Montero is an alien currently detained without bond pursuant to the decision of an immigration judge. He here seeks his immediate release on bond, stating that he "is not seeking a full-blown hearing on the merits of his claim, but merely and [sic] opportunity to establish his suitability for release on bond." Memorandum of Law in Support of the Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2255 ("Petitioner's Memorandum") (Doc. No. 3) at 11. Respondents

move to dismiss this action for lack of subject matter jurisdiction, contending that Montero has failed to exhaust his administrative remedies by first appealing his bond determination to the Board of Immigration Appeals (the "Board"), a course that they now say is closed to him because he waited too long. In the alternative, Respondents argue that Montero's detention is lawful pursuant to 8 U.S.C. § 1252(b)(2) [sic], as amended by § 440(c) of the Antiterrorism and Effective Death Penalty Act of 1996 (the "Antiterrorism Act"), Pub.L. 104–32 (April 24, 1996).[1]

## II. Statement of Facts

On June 9, 1978, the Service first initiated deportation proceedings against Montero, a citizen of the Dominican Republic who had been in the United States since overstaying a visa issued him in 1972. Six months later, Montero adjusted his status to that of lawfully admitted permanent resident based upon his marriage to a United States citizen. Montero remained in the United States until January 20, 1984, when he was deported following a 1981 conviction in the Massachusetts Superior Court sitting in and for the County of Suffolk for possession of cocaine with intent to distribute in violation of Mass. Gen.L. ch. 94C, § 31. Although the record is not clear on this point, it appears that Montero was incarcerated for a period of time in Massachusetts and was then deported following the termination of his incarceration.

In March, 1986, Montero illegally reentered the United States. He was detained by the Service on April 18, 1996 and taken into custody. At the time of his arrest by the Service, Montero was not incarcerated or otherwise in the custody of any state or federal government, his earlier state conviction having run its course. During the April 1996 detention proceedings, a Service employee determined that Montero should be detained by the Service and denied a request for bail. On May 1, 1996, Montero appeared before Immigration Judge Billino D'Ambrosio for a bond redetermination pursuant to 8 C.F.R. § 242.2(d). With the assistance of counsel, Montero conceded that he was a deportable alien under 8 U.S.C. § 1251(a)(2)(B)(i) [alien convicted of violating laws relating to a controlled substance] and told Judge D'Ambrosio that he would apply for relief from deportation pursuant to 8 U.S.C. § 1254(a)(2).[2] On May 8, 1996, Judge D'Ambrosio denied Montero's request that he be released on bail conditions, writing that

> Respondent is ineligible for redetermination of custody status. Respondent convicted on June 25, 1981 for the offense of possession of cocaine with intent to distribute. This Conviction places respondent within section 242(a)(2)(B)(i) of the [Immigration and Nationalization] Act[3] for eligibility under Sec. 242(a)(2) of the Act.

Petitioner's Memorandum, Ex. 2 (Order dated May 8, 1996).

1. In their motion to dismiss the habeas corpus petition, Respondents incorrectly cite to 8 U.S.C. § 1252(b)(2) as the basis for detaining Montero. The correct statute is 8 U.S.C. § 1252(a)(2), as amended by § 440(c) of the Antiterrorism Act, which states the following:

   The Attorney General shall take into custody any alien convicted of any criminal offense covered in section 1251(a)(2)(A)(iii) [aggravated felony], (B) [possession of controlled substances], (C) [certain firearm offenses], or (D) [miscellaneous crimes, *e.g.*, espionage, sabotage, sedition, selective service violations] of this title, or any offense covered by section 1251(a)(2)(A)(ii) of this title [conviction of two or more crimes involving moral turpitude] for which both predicate offenses are covered by section 1251(a)(2)(A)(i) of this title [classifying crimes of moral turpitude committed within certain time periods after the date of entry as

deportable offenses], upon release of the alien from incarceration, shall deport the alien as expeditiously as possible. Notwithstanding [other provisions of section 1252], the Attorney General shall not release such felon from custody.
8 U.S.C. § 1252(a)(2).

2. Section 1254(a)(2) allows an otherwise deportable alien to petition the Attorney General for suspension of deportation upon a showing of ten years of good moral character and demonstrated hardship to others.

3. This statute does not exist. Respondents contend that Judge D'Ambrosio meant to refer to section 241 of the Immigration and Nationality Act ("Immigration Act"), codified at 8 U.S.C. § 1251(a)(2)(B)(i), which classifies a conviction of a controlled substance violation as a deportable offense.

Meanwhile, on April 24, 1996, President Clinton signed the Antiterrorism Act into law. Two weeks later, Judge Keeton of this District issued a preliminary decision which reviewed the bail provisions of the Antiterrorism Act, finding certain provisions of the Antiterrorism Act unconstitutional. *See De-Melo v. Cobb*, 936 F.Supp. 30, 33 (D.Mass. 1996) (matter taken under advisement, full opinion issued June 19, 1996). After a subsequent hearing requested by Judge D'Ambrosio in order to address these recent developments, that immigration judge again denied Montero's request for bail conditions on June 14, 1996. As reason for his decision, Judge D'Ambrosio stated that he lacked jurisdiction to consider Montero's custody status under the Antiterrorism Act "since the respondent has been convicted of a controlled substance violation." Petitioner's Memorandum, Ex. 6 (Order dated June 14, 1996).

Montero's attorney has filed an affidavit stating that she filed an appeal of the June 14, 1996 denial of bond by sending the appeal to the Immigration Court in Boston. On June 29, 1996, the Immigration Court directed Montero to file his appeal directly with the Board, pursuant to new filing rules effective July 1, 1996. The appeal was docketed with the Board on July 2, 1996. Subsequent telephone conversations between Montero's attorney and the Board indicate that it will take at least three months, possibly longer, to obtain a hearing on a bond appeal in a predeportation detention such as Montero's. Montero's attorney has also been told that, even if the Service stipulated to an expedited hearing, it would take not less than three months to hear the appeal. Affidavit of Lenore Glaser, Esq. at 1–2.

### III. Analysis

*A. Exhaustion Requirement*

Respondents contend that this Court ought dismiss Montero's petition because he has failed to exhaust his administrative remedies by appealing his bond redetermination to the Board. In their pleadings, Respondents repeatedly assert that Montero "failed to appeal [the May 8, 1996 bond denial] administratively," state that they "believe that no timely appeal of the May 9, 1996, or June 14,

1996, decisions of the [Immigration Judge] was filed with the [Board]," and declare that "[Montero] had the opportunity to obtain administrative relief, and did not elect to pursue such relief." Respondent's Answer and Memorandum in Opposition to Petition for Habeas Corpus Relief, and in the Alternative, Memorandum Supporting Motion to Dismiss ("Respondents' Memorandum") at 3; Respondent's Supplemental Memorandum in Opposition to Petition for Habeas Corpus Relief, and in the Alternative, Memorandum Supporting Motion to Dismiss ("Respondents' Supplemental Memorandum") at 3.

The Respondents appear to be in error both factually and as matter of law. Factually, as stated in Attorney Glaser's affidavit, upon receiving Judge D'Ambrosio's second and final denial of bail conditions on June 14, 1996, she filed two timely appeals, first with the Immigration Court in Boston, then directly with the Board. Thus, the matter is on appeal with the Board, but will not be heard for another three months. Montero has turned to this court not for a determination of the merits of his deportability, but for an order releasing him on bond pending a final order of deportation.

■ Montero's status—as an alien appealing a final order of deportation or as an alien challenging pre-deportation detention—is important. As matter of law, there is no federal statute—and none has been cited by Respondents—that imposes an exhaustion requirement on pre-deportation detainees. *See Moskalev v. District Director, Immigration and Naturalization Serv.*, Civ.A. No. 95–11218–RGS, slip op. at 6, 1996 WL 622475, at *3 (D.Mass. January 24, 1996) (Alexander, Ch. M.J.) ("[T]he statutory scheme of the immigration act does not require exhaustion for suits challenging predeportation detention") (citations omitted). The exhaustion requirement at issue here is codified at 8 U.S.C. § 1105a, which concerns judicial review of orders of deportation and exclusion. Section 1105a(c) contains the exhaustion requirement for aliens who wish to challenge deportation orders, imposing an exhaustion requirement on all petitioners who are subject to "[a]n order of deportation

or exclusion." 8 U.S.C. § 1105a(c). The language of section 1105a(c) parallels wording used in sections 1105a(a) and 1105a(b), which concern the reviewability in federal court of "final orders of deportation" and "final orders of exclusion" made by the Board. 8 U.S.C. §§ 1105a(a) and (c).

Montero is not subject to a final order of deportation as the term is used in section 1105a: he has been denied bond to be free *pending an order of deportation* based on his status as a previously convicted alien. The distinction is significant. As the Seventh Circuit noted in *Gornicka v. I.N.S.*, 681 F.2d 501, 505 (7th Cir.1982), "it is clear that bond hearings are separate and apart from deportation hearings," and "a bond determination is not a final order of deportation ... and does not effect the deportation proceeding." *Id.; see also Dalis v. Brady*, 766 F.Supp. 901, 905 (D.Colo.1991) (same).

In a case interpreting 8 U.S.C. § 1252(a), the statute at issue here, the District of Kansas held that "the decision of the Attorney General to detain or release an individual pending deportation procedures does not amount to a 'final deportation order'" as used in section 1105a. *El–Youssef v. Meese*, 678 F.Supp. 1508, 1512–13 (D.Kan.1988). Because the Attorney General's decision was not a final deportation order, the district court in *El–Youssef* exercised its jurisdiction to review a *habeas corpus* petition challenging the Attorney General's decision and held that the exhaustion requirement as set forth in section 1105a(c) did not apply. *El–Youssef v. Meese*, 1988 WL 287378, *2 (D.Kan.1988). The holdings in *Gornicka* and *El–Youssef* reflect the conclusions reached by other courts which have considered whether there is an exhaustion requirement for appealing bond determinations for pre-deportation detainees. *See also Nat'l Ctr. for Immigrants' Rights, Inc. v. Immigration and Naturalization Serv.*, 791 F.2d 1351, 1354 (9th Cir.1986), *rev'd on other grounds*, 481 U.S. 1009, 107 S.Ct. 1881, 95 L.Ed.2d 489 (1987) ("The only exhaustion requirement of the [Immigration Act] applies to 'orders of deportation or of exclusion' and not to conditions imposed on

bonds prior to such order."); *cf. Castaneda v. U.S. Dep't of Justice Immigration and Naturalization Serv.*, 740 F.2d 9, 10 (8th Cir. 1984) (holding that delivery bond forfeiture appeals, like bond determination appeals under section 1252[a], are not directly reviewable to Courts of Appeals but are better handled by district courts).

Decisions within this District accord with the case law cited above. In *Moskalev*, Chief Magistrate Judge Alexander held that since there was no exhaustion requirement in pre-deportation cases, a federal district court was not precluded from reviewing an alien petitioner's bond determination, although it was limited to the administrative record from the court below. *Moskalev*, Civ.Act. No. 95–11218–RGS, slip op. at 6–7. More recently, in *DeMelo*, Judge Keeton exercised jurisdiction in a pre-deportation bond case, thus implicitly rejecting any exhaustion argument which might have been raised by the government. *DeMelo*, 936 F.Supp. 30 (D.Mass. 1996).[4] Failing in their attempt to advance a legal argument to support its position, Respondents, in their Supplemental Memorandum, turn to policy reasons why this Court ought decline to exercise jurisdiction. Specifically, Respondents argue that if a district court were to intervene and decide issues of release and bond in the first instance, as Montero urges this Court to do, it would "usurp the Attorney General's statutory authority" to determine whether an alien detained pending deportation proceedings should be released. Respondents' Supplemental Memorandum at 2. Respondents also contend that the Board, as opposed to a federal district court, is in a "better position" "both as to its expertise and in service to the uniform application of the federal immigration statute" to evaluate in the first instance a bail decision. *Id.* at 3. An argument based on policy can not provide greater support than one based on the law, however, and the law is clear. Since the statute, as interpreted by courts both within and without this District, states that the exhaustion require-

---

4. Although the Respondents allege that Judge Keeton committed error in failing to recognize the lack of exhaustion as a basis for defeating the habeas petition in *DeMelo, see* Respondents'

Memorandum at 7, there is no evidence that the exhaustion issue was ever addressed in that case, and, in any event, there is no exhaustion requirement in these types of cases as matter of law.

**92**

ment pertains only to final orders of deportation and not pre-deportation orders such as bond determinations, this Court ought properly exercise jurisdiction over this case.

### B. Retroactive Applicability of 8 U.S.C. § 1252

■ The key issue before this Court is whether section 440(c) of the Antiterrorism Act, which amended 8 U.S.C. § 1252 in certain respects, may be enforced retroactively.[5] President Clinton signed the Antiterrorism Act into law on April 24, 1996. Section 440(c) of the Antiterrorism Act is silent regarding its effective date, but it is well-settled that when a statute does not specify an effective date, it is effective on the date of the enactment of the statute. *See, e.g., United States v. King*, 948 F.2d 1227, 1228–29 (11th Cir.1991), *cert. denied*, 503 U.S. 966, 112 S.Ct. 1701, 118 L.Ed.2d 411 (1992); *United States v. Bafia*, 949 F.2d 1465, 1480 (7th Cir.1991), *cert. denied*, 504 U.S. 928, 112 S.Ct. 1989, 118 L.Ed.2d 586 (1992); *Demars v. First Serv. Bank for Savings*, 907 F.2d 1237, 1238–39 (1st Cir.1990).

■ The language of section 440(c) directs the Attorney General to "take into custody any alien convicted of [certain crimes] ... *upon release of the alien from incarceration.*" 8 U.S.C. § 1252(a)(2) (emphasis added). Montero's principal argument is that by stating that the Service shall take into custody aliens "*upon release* of the alien from *incarceration,*" Congress did not intend to apply the mandatory detention provision retroactively to individuals such as Montero who have been released from incarceration *prior* to the enactment of the Antiterrorism Act on April 24, 1996. Montero argues that the

phrase "upon release of the alien from incarceration" are words purposefully chosen by Congress. Since there is "a strong presumption that Congress expresses its intent through the language it chooses," *I.N.S. v. Cardoza–Fonseca*, 480 U.S. 421, 432 n. 12, 107 S.Ct. 1207, 1213 n. 12, 94 L.Ed.2d 434 (1987), Montero, because he was neither incarcerated nor released from incarceration on April 24, 1996, is not affected by the section 440(c) of the Antiterrorism Act.

Respondents—not surprisingly—contend that section 440(c) applies to Montero. Distilled to its essence, Respondents argue that Montero's 1981 drug conviction renders him deportable under 8 U.S.C. § 1251(a)(2)(B)(i). Since the Attorney General has the statutory authority to arrest and take into custody "any alien" pending "final determination of deportability," *see* 8 U.S.C. § 1252(a)(1), and since Montero was lawfully detained under this provision on April 18, 1996—six days *prior* to the enactment of section 440(c)—the provisions of section 440(c) apply to him as well as all other aliens in custody on that date. Respondents further argue that such an application of section 440(c) does not constitute a retroactive application of the statute, and the date of Montero's prior conviction is irrelevant. *See Cox v. Hart*, 260 U.S. 427, 435, 43 S.Ct. 154, 157, 67 L.Ed. 332 (1922) ("A statute is not made retroactive merely because it relies upon antecedent facts for its operation."); *De Osorio v. I.N.S.*, 10 F.3d 1034, 1042 (4th Cir.1993) (it is "well established that Congress has the authority to attach present immigration consequences to past criminal activity and has done so on numerous occasions in the past").

The two cases which have a specific bearing upon this case are a 1994 Supreme Court

---

**5.** Section 440(c) of the Antiterrorism Act made many significant changes to 8 U.S.C. § 1252(a) with respect to detention of aliens who had committed crimes. Along with increasing the number of crimes for which an alien can be deported, it mandates the detention of serious criminal aliens during the course of their deportation hearings. Prior to the 1996 amendment, section 1252(a)(2) contained a number of exceptions which had broadened the availability of bond detention hearings. For example, section 1252(a)(2) originally provided that the Attorney General was to take into custody all aliens convicted of aggravated felonies. *See* the Anti–Drug Abuse Act, Pub.L. 100–690 (inserting original language of section 1252(a)(2) into Immigration Act). Section 1252(a)(2) was later amended to create an exception to mandatory detention for an alien admitted for permanent residence who established that he or she was not a threat to the community and that there was a strong likelihood that the alien would be present for future hearings. Section 440(c) deleted the above exception and others which increased the availability of bond hearings.

case, *Landgraf v. USI Film Prods.*, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), and a recent case decided by Judge Keeton in this District, *DeMelo v. Cobb*, 936 F.Supp. 30 (D.Mass.1996). In *DeMelo*, Judge Keeton held that, based on the circumstances of the case before him, it was improper retroactively to apply section 440(c) of the Antiterrorism Act to DeMelo's case. The facts of the *DeMelo* case are similar to the facts of the case before this Court: On January 26, 1996, Petitioner Jose DeMelo ("DeMelo"), a permanent legal resident of the United States for almost thirty years, was taken into custody by the Service and held pending the resolution of deportation proceedings.[6] On March 11, 1996, an Immigration Judge applied a standard requiring detention absent findings that "such alien is not a threat to the community and that the alien is likely to appear before any scheduled hearings," as required by 8 U.S.C. § 1252(a)(1)(B).[7] Upon review at a hearing on DeMelo's habeas corpus petition on May 7, 1996, the government contended that even if the Immigration Judge's order of March 11, 1996 was in error as matter of law, there was an additional reason to hold DeMelo because section 440(c)—signed into law ten days earlier— compelled detention since DeMelo had been convicted in March 1993 for unlawful possession of a firearm. Judge Keeton flatly rejected the government's alternative argument. Judge Keeton issued an interlocutory order releasing DeMelo on $500.00 bond pending further order of his or a higher court.

The court in *DeMelo* placed particular emphasis on the fact that the conviction upon which the Service relied in order to hold DeMelo occurred over three years before the enactment of the Antiterrorism Act. Since "DeMelo had already served every sentence imposed upon him as a result of [the 1993] felony conviction," *DeMelo*, 936 F.Supp. at 34, applying the Antiterrorism Act to his case "would accomplish the practical equivalent of punishing DeMelo yet again for a crime for which he has already completed the sentence imposed upon him," *Id.* at 34. Judge Keeton reasoned that there was no way the Service could have relied on section 440(c) in arguing to detain DeMelo, since it was signed into law long after DeMelo was first held in January. *See DeMelo*, 936 F.Supp. at 34 ("[E]ven if § 440 of the Antiterrorism Act applies to aliens who are both convicted before April 24, 1996, it can not apply to aliens who are both convicted and *released* from incarceration before April 24, 1996.") (emphasis in original). Furthermore, if not for the Immigration Judge's erroneous ruling, DeMelo

---

**6.** DeMelo was arrested in January 1996 for driving while intoxicated and misdemeanor assault on a police officer. He was then detained by the Service. *DeMelo*, 936 F.Supp. at 34. Here the facts of *DeMelo* and those of this case diverge somewhat, but not meaningfully. The facts surrounding Montero's original detention are that he attempted to reenter the United States without inspection in March 1986 and was subsequently detained on April 18, 1996. There is no explanation how Montero came to the attention of immigration authorities after illegally residing in the United States for ten years. Assuming *arguendo*, however, that section 440(c) *does* apply retroactively in this case, illegal entry is neither an aggravated felony under section 1251(a)(2)(A)(iii); a firearm offense under section 1251(a)(2)(C); an enumerated miscellaneous crime under section 1251(a)(2)(D); or a moral turpitude offense covered by section 1251(a)(2)(A)(ii). For this reason, it is improper for the Service to rely upon section 1252(a)(2) as a basis for detaining Montero.

Whether or not section 1252(a)(2) applies to this case, there would also have been an adequate reason to detain Montero based upon section 1252(a)(1) (allowing three options for an alien pending review of deportability: arrest, release under bond, or release under conditional parole). The following language from *DeMelo*, written by Judge Keeton, is particularly instructive: "If the Immigration Judge [in *DeMelo*] had not made this erroneous order, DeMelo would have been released from INS custody before the enactment of the Antiterrorism Act, and he would not be a petitioner in this court today." *DeMelo*, 936 F.Supp. at 34. The same logic should apply here: although it is possible Montero would still have been detained under section 1251(a)(1) upon his apprehension on April 18, section 1251(a)(1) prescribes three different options to the Immigration Judge as opposed to section 1251(a)(2), which states that the Attorney General "shall" take aliens convicted of certain crimes into custody.

**7.** Section 1252(a)(1)(B), which originally created an exception to pre-deportation detention, was deleted by section 440(c) and replaced with the language contained in the Antiterrorism Act.

would never have been held past April 24, 1996.

With respect to the argument against applying section 440(c) retroactively, Judge Keeton relied heavily upon the Supreme Court's 1994 *Landgraf* decision. In *Landgraf*, the Supreme Court analyzed the Civil Rights Act of 1991 (the "Civil Rights Act") and determined that it did not apply to cases pending at the time of the statute's enactment. Like section 440(c), the Civil Rights Act did not contain any language about its effective date, although other sections had specific language calling for prospective application not of the entire statute, but only of those sections. *See Landgraf*, 511 U.S. at ——, 114 S.Ct. at 1493. Parsing the various sections of the Civil Rights Act, the Supreme Court reasoned that "[a] statement that a statute will become effective on a certain date does not even arguably suggest that it has any application to conduct that occurred at an earlier date," *id.*, and ultimately concluded that Congress must provide an unambiguous directive where it intends to apply a statutory provision retroactively, *id.* at ——, 114 S.Ct. at 1501. "Requiring clear intent," wrote the Court, "assures that Congress itself has affirmatively considered the potential unfairness of retroactive application and determined that it is an acceptable price to pay for the countervailing benefits." *Id.* at ——, 114 S.Ct. at 1501.

Respondents make three arguments as to why, despite the *Landgraf* opinion, section 440(c) ought apply. Only one argument addresses the Supreme Court's decision that Congress must make explicit its desire for a statute to apply retroactively, and it is fatuous. Respondents contend that Congress intended section 440(c) to apply to criminal aliens detained on the date of the enactment regardless of the date of their convictions because, although section 440(c) is silent as to its effective date, Congress specified an effective date in text located elsewhere in the Antiterrorism Act. Similar to the text of the Civil Rights Act analyzed in *Landgraf*, section 440(f) of the Antiterrorism Act provides that amendments made by section 440(*e*)— which amendment has nothing to do with the

case at bar—"shall apply to convictions entered on or after the date of the enactment of this Act...." Addressing this distinction, Respondents argue that "[c]learly, if Congress had wanted § 440(c) to apply to cases only where the alien's conviction occurred after the effective date of the [Antiterrorism Act], it could have, and would have, made its intent clear as it did in § 440(f)." Respondents' Memorandum at 13 (citation omitted). Respondents' argument is essentially that since another section of section 440 contained language calling for prospective application of the Antiterrorism Act, and since Congress failed to include similar lucid text with respect to *prospectively* implementing section 440(c), its silence may therefore be construed as an explicit statement concerning section 440(c)'s *retroactive application*. Ironically, the Supreme Court rejected just such a textual argument in *Landgraf*, 511 U.S. at —— -- ——, 114 S.Ct. at 1493–94, and this argument must also miss the mark given the Supreme Court's unambiguous holding to the contrary.

■ Finally, Respondents contend that section 440(c) is rationally related to an important governmental interest, namely, that criminal aliens ought expeditiously be removed from the United States. Given this interest and the Supreme Court's holding in *Fiallo v. Bell*, 430 U.S. 787, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977), Respondents contend that this Court's review is governed by a highly deferential standard. *See Fiallo*, 430 U.S. at 792, 97 S.Ct. at 1477–78 (holding that since Congress has "broad congressional power [over immigration and naturalization] ... immigration legislation is subject to a limited scope of judicial inquiry."). This contention is incorrect, since the majority of district courts which have addressed mandatory immigration detention statutes have held the *Fiallo* standard to be inapplicable where the adequacy of procedures are at issue. *See, e.g., Kellman v. Dist. Dir., U.S. INS*, 750 F.Supp. 625, 627 (S.D.N.Y.1990) (striking down earlier version of section 1252[a]). In this case, Montero is contesting not the merits of his deportation, but the adequacy of the process employed to determine whether he can be released on bond or not pending a final order of deportation. Indeed, on Au-

gust 12, 1996, the Southern District of New York held that a mandatory immigration detention statute similar to the one at issue here, 8 U.S.C. § 1226(e), was unconstitutional. *See Cruz–Taveras v. McElroy,* Civ.A. No. 96–5068(MBM), slip op. at 7, 1996 WL 455012 (S.D.N.Y. August 12, 1996); *see also Thomas v. McElroy,* 96 Civ. 5065 (JSM), slip op. at 5, 1996 WL 487953 (S.D.N.Y. August 23, 1996) (same holding).

Yet another recent decision, this one from the Western District of Washington, reaches the same conclusion as this Court based upon similar facts. In *Villagomez v. Smith,* Case No. C96–1141C 1996 WL 622451 (W.D.Wa. July 31, 1996), Judge Coughenour released a legal permanent resident from custody after he was held pursuant to 8 U.S.C. § 1252(a)(2), the statute at issue here. The Service sought to deport the plaintiff, Roberto Morales Villagomez ("Villagomez") based upon a 1989 conviction for possession of heroin, the sentence for which Villagomez had already served. In making its ruling, the court was influenced by the fact that "the conviction used by the [Service] to justify [Villagomez's] deportation and the application [of] § 440 took place almost *seven years prior* to the enactment of the [Antiterrorism Act]." *Villagomez,* Order on TRO at 5 (emphasis added). In fact, the court wrote that:

> [n]othing in § 440, or the remaining portions of [the Antiterrorism Act], supports the [Service's] contention that Congress has manifested an intent to apply [the Antiterrorism Act] to aliens convicted and released prior to its enactment. Indeed, the [Service's] position on this matter selectively ignores the straightforward language mandating that the Attorney General shall take into custody any alien 'upon release from incarceration.'

*Id.* at 6 (citation omitted). A thorough reading of both the case law and section 1252(a)(2), buoyed by the logic of Judge Keeton in *DeMelo* and guided by a similar conclusion reached in *Villagomez,* thus propels this Court to the following conclusion.

### IV. Conclusion

Throughout his pleadings, Montero has made clear that the only relief he seeks is that this Court require the Service to hold a hearing to determine if release is appropriate. At the very least, this relief must be granted. Accordingly, Respondent's Motion to Dismiss is hereby **DENIED** and the petition for habeas corpus is **GRANTED** on the following terms:

1. Within ten (10) days of the date of this decision, the Service shall either (a) hold a hearing to determine whether Montero's release on bail is appropriate or (b) successfully move for a stay of this order before the United States Court of Appeals for the First Circuit.

2. Should neither of the options set forth in paragraph one occur, Montero shall be released on $500.00 cash bond until the hearing ordered in paragraph one occurs or until a final order of deportation is entered.

IT IS SO ORDERED.