# In re Valentin VALDEZ-Valdez, Respondent

File A34 450 528 - San Antonio

*Decided January 30, 1997*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

(1) The Transition Period Custody Rules invoked on October 9, 1996, govern bond redeterminations of aliens falling within the nonaggravated felony criminal grounds of deportation covered in those rules, regardless of when the criminal offenses and convictions occurred.

(2) The Transition Period Custody Rules govern bond redetermination appeals of otherwise covered criminal aliens who are not now in custody by virtue of immigration bond rulings rendered prior to the October 9, 1996, invocation of those rules.

FOR RESPONDENT: Alberto Cruz, Accredited Representative

AMICUS CURIAE[1]: Marc Van Der Hout, Esquire, San Francisco, California

AMICUS CURIAE[1]: Kelly McCown, Esquire, San Francisco, California

FOR THE IMMIGRATION AND NATURALIZATION SERVICE: Scott M. Rosen, Appellate Counsel

BEFORE: Board En Banc: SCHMIDT, Chairman; DUNNE, Vice Chairman; HEILMAN, HOLMES, HURWITZ, VILLAGELIU, FILPPU, COLE, and MATHON, Board Members. Dissenting Opinion: ROSENBERG, Board Member, joined by VACCA and GUENDELSBERGER, Board Members.

FILPPU, Board Member:

   This is a bond redetermination case originally appealed to the Board by the Immigration and Naturalization Service. While the appeal was pending, Congress enacted the Transition Period Custody Rules ("transition rules") in section 303(b)(3) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546, 3009-586 (enacted Sept. 30, 1996)("IIRIRA"). Effective on October 9, 1996, the transition rules set forth new standards for releasing criminal aliens from

---

[1] This Board acknowledges with appreciation the thoughtful arguments raised in amicus curiae's brief.

immigration detention pending proceedings respecting their removal from this country. In *Matter of Noble*, 21 I&N Dec. 672 (BIA 1997), we held that bond redeterminations of detained deportable aliens convicted of an aggravated felony are presently governed by the transition rules, irrespective of how or when the alien came into immigration custody.

The case before us is a companion case to *Noble*. It presents two issues. The first issue is whether the transition rules govern bond redeterminations of aliens who are presently not detained, but were freed from immigration custody before the transition rules took effect on October 9, 1996. The second issue is whether the transition rules apply to aliens falling within a nonaggravated felony criminal ground of deportation covered by the transition rules, even if the criminal offenses and convictions occurred before those rules became effective.

The Board requested supplemental briefing from the parties and amici on these issues. The Service submitted a brief arguing its position that the transition rules applied to this case. But, in the last sentence of its brief, the Service made a perfunctory request to withdraw the appeal. Notwithstanding this request, we take the case on certification pursuant to our authority in 8 C.F.R. § 3.1(c) (1996) to resolve these important issues. Upon certification, we hold that the transition rules govern this case. The record will be remanded to the Immigration Judge.

## I. PROCEDURAL HISTORY

The respondent is a 25-year-old native and citizen of Mexico who entered the United States as a lawful permanent resident in 1973 at the age of 2. His family ties to this country include his wife and three United States citizen children. In 1993, the respondent was convicted under Texas law for the offense of possession of marijuana. For this offense, he was sentenced to 7 years' probation with no incarceration.

The respondent was subsequently placed in deportation proceedings. In an Order to Show Cause and Notice of Hearing (Form I-221) dated September 11, 1995, the Service charged the respondent with deportability as having been convicted of a controlled substance violation under section 241(a)(2)(B)(i) of the Immigration and Nationality Act, 8 U.S.C. § 1251(a)(2)(B)(i) (1994). The record indicates that the respondent was taken into Service custody in September of 1995. Shortly thereafter, he successfully posted a $1000 bond, evidently set by the district director pursuant to the then-governing release standards.[2] *See Matter of Patel*, 15 I&N Dec. 666 (BIA 1976).

On May 1, 1996, the respondent was taken back into Service custody when he appeared at the Immigration Court for a deportation hearing. His

---

[2] In September 1995, the statutory provision governing custody determinations for aliens deportable on nonaggravated felony grounds was section 242(a)(1) of the Act, 8 U.S.C. § 1252(a)(1) (1994). It provided, in relevant part:

$1000 bond was apparently canceled. At a custody redetermination hearing on May 3, 1996, the Service argued before an Immigration Judge that the respondent was not eligible for release on bond. According to the Service, the respondent's controlled substance violation triggered the then newly enacted mandatory detention requirement contained in section 440(c) of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214, 1277 (enacted Apr. 24, 1996) ("AEDPA").[3] The Immigration Judge disagreed and authorized the respondent's release on the previously set $1000 bond.

After the Service filed motions to stay and reconsider, the Immigration Judge prepared a written memorandum dated June 3, 1996, explaining her reasons for setting a bond. The Immigration Judge concluded that the mandatory detention requirement of section 242(a)(2) of the Act, as amended by the AEDPA's section 440(c), did not apply to the respondent because it covered, according to the reading of the statutory language adopted by the Immigration Judge, only those aliens released from criminal incarceration after the AEDPA's April 24, 1996, effective date. The Immigration Judge further concluded that an increase in the bond amount was not warranted, based on a finding that the respondent's risk of flight was minimal. She recognized that the respondent was ordered deported in separate proceedings on May 30, 1996, but noted that the respondent had reserved appeal in that case. There is nothing in the record demonstrating that the Immigration Judge considered whether the respondent was a danger to the community. The Immigration Judge denied the Service's motions to stay and reconsider her prior order releasing the respondent on bond. The record reflects that the respondent posted the bond and was out of immigration custody shortly after the Immigration Judge's written decision was entered.

The Service's appeal ensued. It argued on appeal that the Immigration Judge erred in finding the respondent was not subject to the mandatory

---

Except as provided in paragraph (2), any such alien taken into custody may, in the discretion of the Attorney General and pending such final determination of deportability [as provided in subsection (b)], (A) be continued in custody; or (B) be released under bond in the amount of not less than $500 with security approved by the Attorney General, containing such conditions as the Attorney General may prescribe; or (C) be released on conditional parole. But such bond or parole . . . may be revoked at any time by the Attorney General, in [her] discretion . . . .

[3] Section 440(c) of the AEDPA amended section 242(a)(2) of the Act, which, following its amendment, read as follows:

The Attorney General shall take into custody any alien convicted of any criminal offense covered in section 241(a)(2)(A)(iii), (B), (C), or (D) of this title, or any offense covered by section 241(a)(2)(A)(ii) of this title for which both predicate offenses are covered by section 241(a)(2)(A)(i) of this title, upon release of the alien from incarceration, shall deport the alien as expeditiously as possible. Notwithstanding paragraph (1) or subsection (c) and (d) of this section, the Attorney General shall not release such felon from custody.

detention requirement enacted by the AEDPA. While the appeal was pending, however, the transition rules became effective on October 9, 1996, and replaced section 440(c) of the AEDPA on that date.[4] *See Matter of Noble, supra*, at 5.

In light of the change in governing standards, this Board requested supplemental briefs from the parties and amici addressing the question of whether the transition rules applied to this case and, if not, what standards would apply. The record reflects that the respondent remains out of immigration custody and that his appeal of his separate deportation case is currently pending before this Board.

## II.  LEGAL BACKGROUND

Since the respondent's 1993 conviction, Congress has twice changed the civil immigration detention and release standards governing criminal aliens. These statutory amendments occurred in April and September of 1996.  Prior to April 1996, custody determinations for aliens deportable on nonaggravated felony grounds were governed by the general bond provisions found in section 242(a)(1) of the Act, under which it was presumed that an alien would not be detained or required to post bond unless there was a finding that the alien is a threat to the national security or a poor bail risk.  *Matter of Patel, supra.*

In April 1996, however, Congress eliminated the Attorney General's authority to release from detention most criminal aliens.  Pursuant to the AEDPA's amendments to section 242(a)(2) of the Act, the Attorney General had no authority to release any alien convicted of an aggravated felony, a

---

[4] The Transition Period Custody Rules are set forth in section 303(b)(3) of the IIRIRA and read, in pertinent part:

 (A)  IN GENERAL.  During the period in which this paragraph is in effect . . . , the Attorney General shall take into custody any alien who -. . .

  (ii)  is inadmissible by reason of having committed any offense covered in section 212(a)(2) of such Act,

  (iii) is deportable by reason of having committed any offense covered in section 241(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of such Act (before redesignation under this subtitle) . . . .. . .

 (B) RELEASE. - The Attorney General may release the alien only if the alien is an alien described in subparagraph (A)(ii) or (A)(iii) and -

  (i)  the alien was lawfully admitted to the United States and satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding, or

  (ii) the alien was not lawfully admitted to the United States, cannot be removed because the designated country of removal will not accept the alien, and satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding.

controlled substance offense, a firearms offense, any miscellaneous criminal offense described in section 241(a)(2)(D), or two crimes of moral turpitude, as long as any of these offenses brought an alien within one of the "covered" grounds of deportation. *See* AEDPA § 440(c).

In the IIRIRA, enacted in September 1996, Congress temporarily restored some discretionary authority to the Attorney General to release from custody most of the criminal aliens previously subject to mandatory detention. *See* IIRIRA § 303(b)(3), 110 Stat. at 3009- 586; *Matter of Noble, supra*, at 674-75. The transition rules became effective on October 9, 1996, and authorized, under specified conditions, the release of aliens convicted of offenses covered in the deportation grounds listed in the transition rule statute. For nonaggravated felons, however, the release standards under the transition rules are more restrictive than the bond provisions which governed prior to the AEDPA's enactment. Under the new standards, the alien must demonstrate that he was either lawfully admitted or cannot be removed because the designated country will not accept him, that he will not pose a danger to safety of persons or of property, and that he will likely appear for any scheduled proceeding.

In *Matter of Noble, supra*, we read the transition rules as governing all detained criminal aliens irrespective of how or when the alien came into immigration custody, unless applying the new standards would have a prohibited retroactive effect under *Landgraf v. USI Film Products,* 511 U.S. 244 (1994). In *Noble*, we found no retroactivity problem as applied to aggravated felons.

We left open several questions in *Noble* regarding the transition rules. We explicitly reserved deciding whether it would be impermissible to apply the transition rules retroactively to an alien deportable on a criminal offense covered in the specified grounds of deportation, when the offense was not an aggravated felony. We also did not reach the question of whether the transition rules applied to nondetained aliens who posted immigration bonds prior to the October 9, 1996, invocation of those rules, and whose bond cases were on appeal to us at that time.

We now turn to these questions.[5]

## III.  ISSUES PRESENTED

The issues presented in this case are as follows:

1.  Whether the Transition Period Custody Rules govern a pending bond redetermination appeal of an alien who has posted bond and was freed from immigration custody prior to the October 9, 1996, invocation of those rules.

---

[5] Given our readings of sections 303(b)(2) and (3) of the IIRIRA in *Matter of Noble, supra,* we again find it unnecessary to address the question of whether the Immigration Judge erred in finding that section 242(a)(2) of the Act, as amended by section 440(c) of the AEDPA, applied only to those aliens released from criminal incarceration after the April 24, 1996, effective date of the AEDPA.

2. Whether applying the Transition Period Custody Rules to a criminal alien who is deportable for having committed a nonaggravated felony offense covered in the statute would be impermissibly retroactive, when both the commission of the offense and the conviction took place before either the AEDPA amendments or the transition rules went into effect.

## IV. THE TRANSITION RULES COVER BOND APPEALS OF ALIENS PREVIOUSLY RELEASED FROM SERVICE CUSTODY

We proceed first with the question of whether the transition rules govern a bond redetermination appeal involving an alien who posted bond and was out of immigration custody prior to the date those rules took effect, assuming the alien otherwise falls within those rules. We find that they do.

The new release standards are contained in section 303(b)(3)(B) of the IIRIRA. The statute provides that the Attorney General "may release [an] alien" described in either subparagraph (A)(ii) or (A)(iii) only if the alien makes certain showings. The statute does not *directly* address the subject of aliens previously freed under the prior immigration bond law. Nothing in the new law appears to require the Attorney General to rearrest and confine aliens previously released on bond or on their own recognizance pending reassessment under the new law.

For our purposes, however, we read the statutory language to govern any present bond redetermination, whether the alien is physically in Service custody or not. *See Ziffrin v. United States,* 318 U.S. 73 (1943) (finding that an administrative body must apply current law to future acts). This is because new law generally applies to cases pending on appeal at the time of enactment (absent retroactivity concerns), and because the "may release" language of the statute affects our authority to authorize the alien's continued release from custody today.

As an administrative adjudicatory body, we do not assume physical custody of aliens but rather enter bond orders carried out by other governmental officials. As applied to Board adjudications, the "may release" language of the statute speaks to our authority to authorize the release of certain deportable criminal aliens. A simple affirmance of the Immigration Judge in this case would amount to an order authorizing release under a showing that Congress no longer permits for aliens falling in the respondent's circumstances. The setting of a new bond amount would also affect the respondent's detention. If he failed to meet the new amount, for example, and were taken into custody, the alien could be released when he satisfied the new amount pursuant to standards at odds with existing law. We thus find that the transition rules, properly construed, apply to present bond redeterminations of aliens deportable by virtue of convictions covered by the statute, including to cases of aliens released from Service custody prior to our adjudication of the appeals.

Our reading of the statutory language is most consistent with congressional intent. As we indicated in *Noble, supra*, the legislative history reflects that the detention provisions of the IIRIRA were geared toward ensuring community safety and the criminal alien's appearance at all deportation hearings. It is not apparent why these same concerns would not extend to the cases of previously bonded aliens with live appeals pending before us.

Nothing in the language of the transition rules appears to prevent us from applying the new standards on appeal in the case of an alien erroneously granted bond in a hearing taking place after the October 9, 1996, invocation date of those rules. The mere fact that an alien has bonded out of custody, therefore, would not exempt that alien from the constraints of the new law when the case is entertained on appeal by us. And, we see nothing in the statutory language to distinguish the cases of aliens erroneously bonded out under the new law from cases of aliens either rightly or wrongly bonded out under prior law, as long as their appeals were still pending before us when the law was changed.

We thus conclude that the transition rules govern bond redetermination appeals before this Board involving aliens who posted bond and were freed from immigration custody prior to the October 9, 1996, invocation of those rules.

## V. APPLYING TRANSITION RULES DOES NOT IMPLICATE RETROACTIVITY CONCERNS FOR NONAGGRAVATED FELONS

We next address whether, given the absence of guiding instructions from Congress, the transition rules apply to an alien who was convicted of a criminal offense, which does not amount to an aggravated felony, before the AEDPA amendments and the transition rules took effect. We find that the transition rules govern such cases. Our conclusion is consistent with the Supreme Court's established framework for determining retroactivity of a statute, as well as federal circuit case law dealing with amendments to bond provisions in the criminal context. *See Landgraf v. USI Film Products, supra*.

Pursuant to the teachings of *Landgraf*, when Congress does not prescribe the temporal reach of a newly enacted statute, it is presumed that the statute does not apply to events antedating its enactment if doing so would impair substantive rights in place before that date. The *Landgraf* Court noted that deciding retroactivity is not a simple or mechanical task, but one that should be guided by considerations of fair notice, reasonable reliance, and settled expectations. *Landgraf, supra,* at 268. A statute, however, is not impermissibly retroactive simply because it applies to conduct predating its enactment. *Id.* at 269. Rather, retroactivity arises only if its application "would impair rights a party possessed when he acted, increase a party's

liability for past conduct, or impose new duties with respect to transactions already completed." *Id.* at 280.

### A. Release Under the Transition Rules Constitutes Prospective Relief

We find at the outset that the new statute is not subject to retroactivity concerns because an alien's eligibility (or continued eligibility) for release on bond should be considered a form of prospective relief in the context of *Landgraf.* We read the statutory language of the transition rules as regulating the Attorney General's authority to detain and to release deportable criminal aliens presently, not as regulating the respondent's past conduct. *See Matter of Noble, supra,* at 17. The new release statute, for example, does not increase the punishment, nor change the ingredients of the offense or the ultimate facts necessary to establish guilt. The respondent's past conduct is relevant in the operation of the statute, but only insofar as it bears on the Attorney General's present authority to make a custody or bond determination.

Bond determinations, in one sense, routinely involve antecedent events, because one of the factors pertains to the ground of deportability. But they primarily involve future considerations, such as whether the alien will appear at his hearing, or whether the alien will pose a threat in some respect if released. *See, e.g., Carlson v. Landon,* 342 U.S. 524 (1952); *Matter of Drysdale,* 20 I&N Dec. 815 (BIA 1994); *Matter of Ellis,* 20 I&N Dec. 641 (BIA 1993); *Matter of Patel, supra; Matter of San Martin,* 15 I&N Dec. 167 (BIA 1974); *Matter of Moise,* 12 I&N Dec. 102 (BIA 1967). Importantly, bond is a prospective benefit because the question of its availability only arises after the alien is in custody. To the extent that antecedent events come into play, they bear either upon the question of present deportability itself or on predicting future behavior from past courses of conduct, such as the inferences that may be drawn in immigration bond proceedings respecting an alien who failed to show up for earlier criminal proceedings. *See generally United States v. Salerno,* 481 U.S. 739, 747-753 (1987); *Schall v. Martin,* 467 U.S. 253 (1984). Thus, release on bond should be considered a form of prospective relief within the *Landgraf* context, even though facts in the operation of the statute draw from a time antecedent to its effective date. *See Landgraf, supra,* at 270 n.24 (noting that a statute "'is not made retroactive merely because it draws upon antecedent facts for its operation'") (quoting *Cox v. Hart,* 260 U.S. 427, 435 (1922)).

It is the fact of present deportability that is the real underlying concern of the statute, not simply whether the particular alien was "convicted" of a certain offense. The transition rules impose certain limitations on the release of aliens who have committed certain offenses "covered" in the specified grounds of deportation. Not all convictions for even the same crime will lead to actual deportability on account of such convictions, if for no other reason

than the existence of temporal restrictions on the applicability of the deportability charge. *See, e.g.,* AEDPA § 435, 110 Stat. at 1274-75 (providing that crime involving moral turpitude amendments apply to aliens against whom deportation proceedings are initiated after the date of enactment); section 241(a)(2)(A)(i) of the Act, 8 U.S.C. § 1251(a)(2)(A)(i) (1994) (providing that single crime of moral turpitude, pertinent to the *permanent* custody provision of the IIRIRA, must occur within 5 years after entry to lead to deportability under this subsection).

It is not the simple fact of the conviction which leads to the application of the custody provisions of the statute, but whether the particular conviction is actually "covered" by the grounds of deportation, including any prospective effective date provisions specified by Congress. Consequently, in the end, the custody provisions of the new statute are inherently tied to the question of present deportability, not to the mere fact of the past convictions themselves. *Cf. Plaut v. Spendthrift Farm Inc.*, 514 U.S. 211, 225 (1995) (identifying retroactive legislation as including "legislation that prescribes what the law *was* at an earlier time, when the act whose effect is controlled by the legislation occurred").

## B. Expectations Stemming From Criminal Proceedings Do Not Lead to Retroactivity Problems

We find further that applying the transition rules to the respondent would not have an impermissible "retroactive effect" within the meaning of *Landgraf*. Amici's assertion that the pre-AEDPA standards should govern this case rests on vested rights and fairness principles. Having considered these arguments, however, we do not find that they represent a correct synthesis of *Landgraf* retroactivity principles. We find that the transition rules, if applied to this case, would not take away any rights possessed by the respondent, increase liability, or attach new legal consequences to past conduct.

We are not convinced that the respondent has the sort of vested right or settled expectation which the Supreme Court sought to describe in *Landgraf*. The new law deprives the criminal alien of nothing to which he was entitled under old law. It would be odd to think that by committing a crime, an alien acquires a vested right to be treated in a particular way in subsequent deportation proceedings, or that in deciding whether to commit the crime the respondent relied to his detriment on the continued application of the existing immigration custody law.

The new standard may make release more difficult for a nonaggravated felon than under the pre-AEDPA standards. This, however, at most creates a practical disadvantage, not an impairment of protected rights. A criminal alien is no different from other aliens in being subject to the will of Congress when it comes to matters associated with his continued presence within our society. *See Harisiades v. Shaughnessy*, 342 U.S. 580, 586-87 (1952) (stating

that resident alien's ability to remain in this country is not a matter of "right" but of "permission and tolerance"); *Ng Fung Ho v. White*, 259 U.S. 276, 280 (1922) (stating that Congress has power to order at any time deportation of aliens whose presence in the country it deems hurtful); *see also Scheidemann v. INS*, 83 F.3d 1517 (3d Cir. 1996) (holding that application of aggravated felony statutory bar to criminal alien convicted before statute's effective date was not impermissibly retroactive); *Samaniego-Meraz v. INS,* 53 F.3d 254, 256 (9th Cir. 1995) (same); *Matter of Gomez-Giraldo*, 20 I&N Dec. 957 (BIA 1995) (same). *See generally Felker v. Turpin*, 518 U.S. 2333 (1996) (deciding a habeas corpus case under the AEDPA, even though the conviction preceded the amendments).

Amici's contrary argument rests to a significant extent on the assertion that "an individual who is convicted under prior law has a right to have that law applied to him." Concerns of unfair surprise by changed law, and settled expectations in prior law, are attenuated in the case of bond relief in the immigration context. Whatever the criminal alien's practical expectations may have been, his conviction (even if entered upon a guilty plea) did not give him a legally enforceable interest in having the civil immigration laws remain static as to how he would be treated in future determinations affecting the deportation process. The alien's freedom was not guaranteed under prior law. Any expectation in this regard was, at best, a hope that changed circumstances may or may not let him realize. *See New York Central R. R. Co. v. White*, 243 U.S. 188, 198 (1917) (stating that "[n]o person has a vested interest in any rule of law, entitling him to insist that it shall remain unchanged for his benefit").

It has not been shown that the commission of a crime is the sort of event that gives rise to vested rights or settled expectations such that changes in the law, outside the confines of criminal law itself, cannot be made without impairing "rights" possessed by the criminal when he or she acted, or without "increasing liability" for past conduct. The civil immigration detention of criminal aliens is not intended to "punish" any past criminal conduct. Rather, the bond provisions exist in order to preserve the government's ability to carry out its present responsibilities over immigration matters. *See Carlson v. Landon, supra*, at 541 (upholding detention without bail of lawfully admitted alien who posed "a menace to the public interest"); *Wong Wing v. United States*, 163 U.S. 228, 235 (1896) (stating that detention is a part of a valid and necessary means to give effect to the provisions for the exclusion and deportation of aliens); *Doherty v. Thornburg*, 943 F.2d 204, 209-11 (2d Cir. 1991) (upholding detention without bond of criminal alien pending deportation, even though detention was prolonged for 8 years), *cert. denied sub nom. Doherty v. Barr*, 503 U.S. 901 (1992). Indeed, it would be quite anomalous if, absent explicit legislative direction to impose statutory changes retroactively, either a criminal act or the results of the criminal justice process froze the noncriminal legal system entirely in place for the perpetrator of the crime.

Our conclusion is not changed by the fact this respondent posted bond and was no longer in immigration detention on the date the new bond provisions took effect. To be "vested," a thing must be "[f]ixed; . . . settled; absolute . . . ; not contingent." *Black's Law Dictionary* 1401 (5th ed. 1979). The immigration bond at issue here lacks these characteristics; it is a privilege extended, as even the statutory language of pre-AEDPA law evidenced, on a contingent, nonabsolute basis, entirely subject to change. *See* section 242(a)(1) of the Act (stating that the Attorney General may "at any time" revoke the alien's bond and take him back into custody); 8 C.F.R. § 242.2(e) (1996) (stating that the district director may revoke the alien's release "at any time" and detain him). The respondent, in particular, was put on notice by the Service's appeal that his bond was subject to dispute and reexamination. He cannot claim any vested interest in the ruling of the Immigration Judge in this respect.

Lastly, we find unpersuasive amici's assertion that the retroactivity question also depends on any general "remedial" legislative purpose of the new law. It is asserted, for example, that the new statute would permissibly apply to aliens placed in a better or the same position than they would have been had the new law not been enacted. Conversely, amici argues that the new law would not apply to aliens made worse off than under prior law. Amici's test, however, does not appear to represent a correct application of retroactivity principles enunciated by the Supreme Court. *See Rivers v. Roadway Express*, 511 U.S. 298 (1994) (finding that a general remedial or restorative purpose does not alone answer the retroactivity question); *see also Plaut v. Spendthrift Farm Inc., supra*, at 1462 (noting that a vaguely remedial purpose of a statute would not, in and of itself, defeat the presumption against retroactivity); *Landgraf, supra*, at 285-86 (stating that simply because the application of a new statute would vindicate its purpose more fully is not sufficient reason to rebut the presumption against retroactivity).

## C. Criminal Bond Law Indicates No Retroactivity Problem

Our conclusion finds support in the criminal bond context. The federal courts have found no retroactivity problems when applying changed bail standards to detained criminal defendants convicted before the passage of the new law. *See United States v. Angiulo*, 755 F.2d 969, 970-74 (1st Cir. 1985) (holding change in pretrial detention standards not impermissibly retroactive, since defendant could not have reasonably relied on promised freedom under old law); *United States v. Miller*, 753 F.2d 19, 21 (3d Cir. 1985) (holding that change in bail standards was not unconstitutional, since change was merely procedural and did not alter any substantive right); *United States v. Crabtree*, 754 F.2d 1200, 1201-02 (5th Cir.) (same), *cert. denied*, 473 U.S. 905 (1985); *United States v. Molt*, 758 F.2d 1198, 1200-01 (7th Cir. 1985) (same), *cert. denied,* 475 U.S. 1081 (1986); *United States v. McCahill*, 765

F.2d 849, 849-51 (9th Cir. 1985) (same); *United States v. Affleck*, 765 F.2d 944, 947-51 (10th Cir. 1985) (same); *United States v. Ballone*, 762 F.2d 1381, 1382-83 (11th Cir. 1985) (same); *see also De Veau v. United States*, 454 A.2d 1308 (D.C. App. 1982) (finding mandatory pretrial detention of defendants charged with first degree murder not ex post facto as applied to defendant who committed crime before effective date), *cert. denied sub nom. Holmes v. United States*, 460 U.S. 1087 (1983), *overruled on other grounds, Lynch v. United States*, 557 A.2d 580 (D.C. App. 1989).

These cases arose before *Landgraf*, but they are remarkably consistent, and seem to reflect the sound judicial instincts described in *Landgraf, supra*, at 270. If retroactivity is not a problem in the criminal bond context, it is difficult to imagine why it would be a problem in the civil immigration context.

The fact that a defendant was not in custody at the time of the enactment created some additional uncertainty in the criminal bond area, as this is the point on which there was a conflict among the courts of appeals that had addressed the question under the Bail Reform Act of 1984. *Compare United States v. Zannino*, 761 F.2d 52 (1st Cir. 1985) (holding that newly enacted bond provisions applied to defendant released on bail before effective date of Act where defendant's expectation of remaining free on bail was minimal), *with United States v. Fernandez-Toledo*, 749 F.2d 703, 705 (11th Cir. 1985) (holding that newly enacted bond provisions did not apply to defendant released on bail before effective date of Act where defendant's rights to bail had already vested).

As previously discussed, however, this respondent was put on notice by prevailing law and the Service's appeal that his continued release on the $1000 bond was subject to revision at any time prior to his deportation. Thus, unlike the defendant in *Fernandez-Toledo*, the respondent cannot claim any justified reliance or vested interest in the ruling of the Immigration Judge in this respect.

Consequently, we see no impediment arising from *Landgraf* in applying the new law to the respondent's present custody determination. *See Ziffrin v. United States, supra* (holding that law as amended during appeal process is to be applied by appellate body in relation to future acts).

## VI. CONCLUSION

In sum, we hold that the Transition Period Custody Rules govern pending bond appeals before this Board involving aliens freed from immigration custody prior to the October 9, 1996, effective date of the transition rules. We also hold that the transition rules apply to aliens falling within the criminal grounds of deportation, not involving an aggravated felony, covered in the transition rule statute, even if the offenses and criminal convictions occurred before those rules took effect. See *Matter of Noble, supra* (applying transition rules to aliens deportable as aggravated felons).

The Immigration Judge released the lawfully admitted respondent under pre-AEDPA bond standards. *See Matter of Patel, supra*. She determined that a $1000 bond was sufficient to ensure the respondent's future appearance at any scheduled hearing. The Immigration Judge did not make a finding regarding dangerousness to the community. We will therefore remand this case to the Immigration Judge to give the respondent the opportunity to demonstrate that he "will not pose a danger to the safety of other persons or of property." *See* IIRIRA § 303(b)(3)(B)(i). If the respondent satisfies this condition, the Immigration Judge should also reassess the amount of the bond in accordance with the requirements of the transition rules. The Immigration Judge should then enter a new decision.

**ORDER:** The record is remanded to the Immigration Judge for further proceedings consistent with the foregoing opinion.

*DISSENTING OPINION:* Lory D. Rosenberg, Board Member, in which Fred W. Vacca, and John W. Guendelsberger, Board Members, joined

I respectfully dissent.

Let me acknowledge at the outset: the Board's decision in *Matter of Noble,* 21 I&N Dec. 672 (BIA 1997), is now precedent by which we are bound.[6] With that in mind, I nonetheless respectfully dissent from both the reasoning and the conclusion reached by the majority, viewing their opinion in this case as the inevitably erroneous progeny of a fundamentally erroneous construction of the relevant sections of the statute set forth in *Matter of Noble, supra*, at 672-686. *See also id*. at 686-702 (Rosenberg, dissenting).

Principally, I disagree with the application of the explicit language of the transition rules to this respondent for the reasons which I discussed in my dissent in *Matter of Noble, supra*. While I realize I am in a minority, I find that the facts of this case make even more prominent the flaws in the majority's construction of the language of sections 303(b)(2) and 303(b)(3)(A) and (B) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546, 3009-586, 3009-587 ("IIRIRA").

The propriety of determining this respondent's release from Immigration and Naturalization Service detention under stricter standards in statutory provisions which do not expressly refer to one such as the respondent, who was convicted before the recent amendments of the statute, who has not been

---

[6] As discussed below, I note that a growing number of federal district courts have rejected a similar interpretation of section 440(c) of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214, 1277 ("AEDPA"), that ignores the explicit language of the statute in determining its reach. However, we are bound by that precedent in any given district, until it is either overruled by a specific federal district court having jurisdiction over the individual case before us, *Matter of K-S-,* 20 I&N Dec. 715 (BIA 1993), or by some other action which operates to modify or supersede our decision.

convicted of an aggravated felony, and who never has been incarcerated, is doubtful. In my view, it compounds the majority's questionable observance of the canons of statutory construction, which favor interpretations that give meaning to plain language and take into account the design of the statute as a whole, which disfavor retroactive applications of the law, and which instruct us to adhere to the principle of lenity in construing ambiguous deportation statutes.

## I.  FACTUAL AND LEGAL BACKGROUND

The respondent, who was lawfully admitted to this country, has resided lawfully in the United States for over 20 years since the age of 2.  He was convicted in 1993 for possession of marijuana, which was not then and is not now an aggravated felony.  *Compare* section 101(a)(43) of the Immigration and Nationality Act, 8 U.S.C. § 1101 (a)(43)(1994), *with* IIRIRA § 321, 110 Stat. at 3009-627; *see also Matter of L-G-*, 21 I&N Dec. 89  (BIA 1995). He was sentenced to probation and was never incarcerated  pursuant to any sentence. He has been living with his family and working and participating in his community before, during, and since the criminal proceedings resulting in his conviction.

In 1993, when this respondent's eligibility for release from detention on bond was initially considered, there existed two standards for such determinations. At that time, eligibility for release from detention in the case of an alien convicted of an aggravated felony offense after November 18, 1988, was determined under section 242(a)(2) of the Act, 8 U.S.C. § 1252(a)(2) (1994).  *Matter of A-A-*, 20 I&N Dec. 492, 497, 499 (BIA 1992);  *Matter of De La Cruz,* 20 I&N Dec. 346 (BIA 1991). That section required an alien who had been lawfully admitted to demonstrate that he did not pose a flight risk or a threat to the community before he could be released from detention; an alien who had not been lawfully admitted was ineligible for release. *See Matter of Drysdale*, 20 I&N Dec. 815, 817-18 (BIA 1994); *Matter of Ellis*, 20 I&N Dec. 641 (BIA 1993).

However, the respondent was not subject to this provision. The respondent's bond was determined under section 242(a)(1) of the Act, which governs the terms of release from detention for criminal aliens, including certain aliens convicted of aggravated felony offenses before November 29, 1990, as well as for aliens whose immigration violations were unrelated to any criminal activity. *Matter of Andrade*, 19 I&N Dec. 488, 489 (BIA 1987); *Matter of Patel*, 15 I&N Dec. 666 (BIA 1976).

When the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 ("AEDPA"), was enacted on April 24, 1996, section 242(a)(2) of the Act was effectively repealed and replaced by the terms of section 440(c) of the AEDPA, which required mandatory detention. In addition to the aggravated felony offenses described in  former section

242(a)(2), section 440(c) of the AEDPA provided for mandatory detention of any alien deportable for a criminal offense of almost any kind. Section 242(a)(1), under which the respondent's bond was determined, has not been repealed, either by section 440(c) of the AEDPA or by any provision of the IIRIRA.

Following the date of this enactment, the respondent appeared for a deportation hearing (in compliance with the terms of his release from detention) and was taken into custody by the Service. The Service claimed the respondent was ineligible for release because, although he was not convicted of an aggravated felony, his conviction came within the broader category of offenses included in the newly enacted AEDPA mandate.

The Immigration Judge correctly found the respondent was not subject to section 440(c) of the AEDPA and the Service appealed. In the meantime, Congress enacted the IIRIRA, containing its own discrete provisions pertaining to custody and detention, including the Transition Period Custody Rules ("transition rules"), which were activated by the Attorney General's notification on October 9, 1996, that the Service had inadequate personnel and detention space to detain the number of aliens who would be subject to detention after enactment of the IIRIRA.

## II. STATUTORY LANGUAGE CONSIDERATIONS

The specific provisions of the IIRIRA in issue, section 303(b)(2) and 303(b)(3) of the Act, refer to two other statutory provisions: amended section 236(c) of the Act which takes effect on April 1, 1997, and section 440(c) of the AEDPA, enacted on April 24, 1996, and in effect at the time of IIRIRA's enactment. In determining the scope of the transition rules, we recognize that those subject to its terms are individuals who were or will be subject to the provisions for which the rules temporarily substitute. *Matter of Noble, supra,* at 680-681; *see also id.* at 696-697 (Rosenberg, dissenting).

## A. Prospective Application *and* Operation of the Provision

I do not differ from the majority in concluding that the transition rules now governing certain bond determinations are prospective. Certainly, they apply to bond determinations subject to their terms which are made following the date of enactment. *Matter of U-M-*, 20 I&N Dec. 327 (BIA 1991), *aff'd*, 989 F.2d 1085 (9th Cir. 1993). Where I do differ is in the application of those rules.

First, I read the provision as a unitary one, describing aliens to be taken into custody by the Attorney General and detained subject to eligibility for release under the terms of section 303(b)(3)(B) of the IIRIRA. Similarly, I read section 440(c) of the AEDPA as a unitary provision describing the "[such] felons" to be taken into custody upon their release from incarceration and held in detention. *Matter of Noble, supra*, at 697-699 (Rosenberg, dissenting).

Second, I view these provisions as clearly prospective, as expressed by the use of the word "when" in the transition rules, and the use of the word "upon" in the AEDPA. In the context of the terminology of the respective provisions, the phrases "when the alien is released" and "upon release from incarceration," refer to specific events which will take place in the future. Therefore, I understand a prospective application, not to mean the self-evident fact that custody determinations are taking place now, but to mean that the statutory amendments are applicable to persons now being taken into custody when they are released from incarceration. *Id*.

Third, I conclude that the language is plain and its scope does not reach the respondent because he was not an alien who was taken into custody by the Attorney General when released from incarceration after October 9, 1996. Similarly, he would not have been covered by the AEDPA because he was not taken into custody upon release from incarceration after April 24, 1996. Therefore he does not come within the transition rules "instead of" the provisions of the AEDPA.

The insistence of the majority on divorcing the Attorney General's function in taking certain criminal aliens into custody upon their release from incarceration from her role in applying specific terms of release to them, is directly contrary to the canons of construction. It fragments sections 303(b)(3)(A) and (B) as though these provisions deal with two distinct groups of individuals or two unrelated processes, rather than interrelated aspects of custody and release. As I emphasized in *Matter of Noble*, an interpretation of the statute which gives effect to the language of each provision and construes the statute as a whole is essential. *K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281 (1988); *COIT Independence Joint Venture v. Federal Sav. and Loan Ins. Corp.,* 489 U.S. 561 (1989); *Matter of W-F-*, 21 I&N Dec. 503 (BIA 1996)

I also emphasized that the canons require us to avoid interpretations which raise questions of constitutional infirmity. For example, we must be mindful to give a restrictive meaning to a provision "if a broader meaning would generate constitutional doubts." *United States v. Witkovich*, 353 U.S. 194, 199 (1957);  *see also Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445-46, (1988).

## B.  Application of the Transition Rules to the Respondent Is Improper

The question before us in this case is whether we can apply the transition rules to an individual who has not been convicted of an aggravated felony, who was never incarcerated as the result of a criminal sentence, who was never taken into custody by the Service upon release from incarceration, and who has never even been held in Service detention. *Compare* IIRIRA § 303(b) *with* AEDPA § 440(c). Again, while this lawfully admitted

respondent, by virtue of the majority decision in this case, now becomes subject only to increased scrutiny under a standard which shifts the burden to him, the ramifications of the majority's decision are far more broad.

Today, an affirmative answer means the imposition of a more harsh standard for release should the Service revoke the bond of an alien deportable on criminal grounds, as it has done here. Tomorrow, it means mandatory detention for such a respondent, since the transition rules are just that—rules to ease a transition to a system of mandatory custody of any alien convicted of a criminal offense or charged with a security violation which renders him deportable.

In both *Matter of Noble, supra*, and in the case before us today, the majority has laid the predicate for a broad and overreaching interpretation, ultimately paving the way to detain, without any hope of release, any alien ever convicted of any crime at any time. This adversely affects both longtime lawful residents and other applicants of long residence or significant equities who qualify for discretionary relief. Such mandatory detention will be imposed without regard to either their convictions or their circumstances, including whether we would ultimately find them exceptionally qualified to remain as a member of our society. *See, e.g., Matter of Pena-Diaz,* 20 I&N Dec. 841 (BIA 1994) (granting suspension of deportation to an alien with a several year old drug conviction, who was not lawfully admitted, on the basis of his lengthy residence of 18 years and strong family ties, which were found to constitute exceptional and extremely unusual hardship).

This increasing encroachment on the liberty interests of such aliens raises critical questions concerning our interpretation of the reach of the transition rules. *See Landgraf v. USI Film Products*, 511 U.S. 244, 280-81 (1994). To determine the amendment's effect in the instant case we turn once again to the language of the statute.

The thrust of the dissent in *Matter of Noble, supra*, is that the statutory language itself is *expressly prospective* as to whom it applies, and that by its terms, the statute limits a retroactive application of the transition rules, except where specifically provided by the language of the statute itself. In fact, the statute refers to section 440(c) of the AEDPA, which previously governed the release of most criminal aliens, as now having been replaced "instead," by the transition rules which were activated effective October 9, 1996. Thus, the IIRIRA provides specifically for a discrete retroactive application, indicating that Congress is perfectly capable of indicating quite clearly a retroactive application when Congress desires one. *See* IIRIRA § 303(b).

The silence of the statute with regard to any other retroactive impact upon conduct or events which already have taken place is significant. Nothing in the text or the legislative history of the AEDPA, and nothing underlying enactment of sections 303(b)(3)(A) and (B) of the IIRIRA, indicates that either section should be applied retroactively to pending cases or

pre-amendment circumstances other than as specified. There is no basis to conclude that this silence was due to an "accident of draftsmanship." *INS v. Phinpathya*, 464 U.S. 183, 191 (1984).

As recognized consistently by the Supreme Court, retroactivity is not favored in the law. *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). A presumption against retroactivity generally is consistent with legislative and public expectations as a safeguard against unfairness. *Landgraf, supra,* at 270-71 (citing *United States v. Heth*, 7 U.S. (3 Cranch) 399, 413 (1806), for the proposition that the Supreme Court has long declined to give retroactive effect to statutes burdening private rights unless Congress has expressed its intent through "'clear, strong and imperative'" language).

The effort to reconcile the canon that the law to be applied is the law in effect at the time of adjudication, with the canon that retroactive applications of the law are disfavored, resulted in the Supreme Court's decision in *Landgraf*. There, the presumption against retroactivity trumped the application of the law in effect at the time of application, when that would offend the "traditional presumption against applying statutes affecting substantive rights, liabilities, or duties to conduct arising before their enactment." *Id*. at 278. Further, as the dissent in *Matter of Noble, supra*, makes clear, the canon that ambiguities in deportation statutes are to be construed in favor of the alien is particularly relevant in determining the reach of a statute such as this one.

When faced with a choice between two readings of a deportation-related provision, the courts and this Board have relied upon the sound principle that we resolve doubts in statutory construction in favor of the alien. *INS v. Cardoza-Fonseca,* 480 U.S. 421, 449 (1987); *INS v. Errico*, 385 U.S. 214 (1966); *Barber v. Gonzales*, 347 U.S. 637, 642 (1954); *Fong Haw Tan v. Phelan*, 333 U.S. 6, 10 (1948); *Matter of Tiwari,* 19 I&N Dec. 875, 881 (BIA 1989). To my knowledge this canon operates with equal force as the other canons, as no hierarchy of canons exists which relegates this canon to a position of less significance in our analysis. The majority nevertheless chose to persist in rationalizing what ultimately, to my mind, is a retroactive application of a prospective provision whose language reflects it was intended to apply to events occurring in the future.

In the past 6 months, over 10 federal courts have found, contrary to the thesis advanced by the majority, that applying the amended rules to an alien such as the respondent not only offends constitutional considerations, but results in an impermissibly retroactive application. Most recently, in *United States v. Igbonwa*, No. 90-375-1, 1996 WL 694178, at 3 (E.D.Pa. 1996), the court stated in no uncertain terms, "The key issue is whether . . . the revised statute, mandating detention, may be retroactively imposed." The court determined that given the "strong presumption against giving retroactive effect to statutes burdening private rights, unless Congress has made clear its intent[,] [citing *Landgraf*] . . . the pre-AEDPA version of [the statute] should

apply . . . ." *Id.* In addition, in *DeMelo v. Cobb*, 936 F. Supp. 30 (D. Mass. 1996), the court found it improperly retroactive to apply section 440(c) of the AEDPA to the case of an alien who both was convicted and served his sentence prior to its effective date.

Furthermore, in *Montero v. Cobb*, 937 F. Supp. 88 (D. Mass. 1996), the court found that an alien who had been convicted of a controlled substance violation in 1981 and released from incarceration prior to enactment of the AEDPA, and who was taken into custody and detained by the Service on April 18, 1996, was not precluded by section 440(c) of the AEDPA from a bond hearing to determine if release was appropriate. In *Villagomez v. Smith,* No. C96-1141C, 1996 WL 622451 (W.D. Wa. July 31, 1996), the court found "straightforward" the language mandating that the Attorney General shall take into custody any alien "upon release from incarceration," and ordered the permanent resident, who already had served his sentence for a 1989 conviction for possession of heroin before the enactment of AEDPA, released from custody. *See also Flanigan v. Reno*, 96-6179-WJR (E) (C.D. Cal. Oct. 1, 1996); *Grodski v. Reno*, No 1:96-cv-2302-ODE (N.D. Ga. Sept. 20, 1996); *Almaguer-Almaguer v. Reno*, No. 96 C 5637 (N.D. Ill. Sept. 6, 1996).

In the absence of an express retroactive provision, and given the considerations discussed above, I do not believe that even under our decision in *Matter of Noble, supra*, the application of the transition rules to this respondent is authorized. Furthermore, I am unpersuaded by the analysis relied upon by the majority in reaching its conclusion that no retroactive application of the law, such as those discussed in *Landgraf*, exists here.

What is at issue here is the respondent's right not to be detained subject to a provision whose language does not apply to his circumstances. This respondent is a lawfully admitted resident who lived here since infancy. Although he was convicted of an offense, his conviction predated enactment of both the AEDPA and the IIRIRA, his conviction was not an aggravated felony, he never was incarcerated for it, and he has remained at liberty in his community. Yet the majority insists that now he must be held subject to a standard which presumes that he shall be maintained in detention.

The interpretation proposed by the dissent in *Matter of Noble, supra*, would have avoided these problems. As we stated in *Matter of A-A-, supra*, it is not merely whether a new law is prospective in operation, but whether its terms otherwise set limitations on the scope of its temporal application. *Id.* at 499. In assessing the applicability of the transition rules, the better course is to acknowledge that the terms of the statute nowhere indicate a retroactive application of the sort reached by the majority. Instead they are expressly prospective, applying only to persons who are taken into custody by the Attorney General once released from incarceration after the relevant effective dates. Prudence dictates that the additional restrictions on liberty contained in the amendments be limited to such persons.