# In re Victor Leonardo ROJAS, Respondent

File A43 903 708  -  Boston

*Decided May 18, 2001*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

A criminal alien who is released from criminal custody after the expiration of the Transition Period Custody Rules is subject to mandatory detention pursuant to section 236(c) of the Immigration and Nationality Act, 8 U.S.C. § 1226(c) (Supp. V 1999), even if the alien is not immediately taken into custody by the Immigration and Naturalization Service when released from incarceration.

FOR RESPONDENT: James C. Dragon, Esquire, Lowell, Massachusetts

BEFORE:      Board En Banc:  SCIALABBA, Acting Chairman; DUNNE, Vice Chairman; HEILMAN, HOLMES, HURWITZ, FILPPU, COLE, MATHON, JONES, GRANT, and OHLSON, Board Members. Concurring and Dissenting Opinion: MOSCATO, Board Member, joined by VILLAGELIU, Board Member.  Dissenting Opinion: ROSENBERG, Board Member, joined by SCHMIDT, GUENDELSBERGER, MILLER, BRENNAN, ESPENOZA, and OSUNA, Board Members.

FILPPU, Board Member:

In a bond order dated October 4, 2000, an Immigration Judge denied the respondent's request for a change in his custody status.  The respondent filed a timely appeal.  The Immigration Judge's reasons for the bond order are set forth in a memorandum dated December 1, 2000.  The respondent's appeal will be dismissed.

## I.  BACKGROUND

The bond record as a whole creates some uncertainty regarding the precise dates on which various relevant events took place.  It is not critical to resolve these uncertainties, because the relevant sequence of events is not in dispute. For purposes of this bond appeal, we will accept the respondent's factual account.

The respondent is a native and citizen of the Dominican Republic who was admitted to the United States as a lawful permanent resident on December 26, 1992.  He was convicted in New Hampshire on March 3, 1998, of the offense

of possession of a controlled substance (cocaine) with intent to sell, and he was sentenced to imprisonment for a term of 2½ to 5 years.  The Immigration and Naturalization Service initiated removal proceedings against the respondent by issuance of a Notice to Appear (Form I-862), which was served on March 25, 1998.  The Service charges that the respondent is subject to removal pursuant to section 237(a)(2)(A)(iii) of the Immigration and Nationality Act, 8 U.S.C. § 1227(a)(2)(A)(iii) (Supp. V 1999), as an alien convicted of an aggravated felony, and pursuant to section 237(a)(2)(B)(i) of the Act, as an alien convicted of a controlled substance violation.

The respondent was released from the custody of the State of New Hampshire on parole.  On July 26, 2000, the second day of his release on criminal parole, he was taken into custody by the Service.  The respondent requested a review by an Immigration Judge of the Service's custody determination.  The respondent argues that he is not subject to mandatory detention under section 236(c) of the Act, 8 U.S.C. § 1226(c) (Supp. V 1999), because he was not taken into custody "when . . . released" from incarceration, but rather was free in the community before being detained by the Service.

## II.  IMMIGRATION JUDGE'S DECISION

The Immigration Judge concluded that the respondent, who is deportable by reason of having committed an offense covered in sections 237(a)(2)(A)(iii) and (B)(i) of the Act, is subject to the mandatory detention provisions of section 236(c) of the Act.  The Immigration Judge rejected the respondent's argument that he is not subject to section 236(c) because the Service failed to apprehend him at the time of his release, instead waiting 2 days before taking him into custody.  The Immigration Judge therefore concluded that he did not have jurisdiction to redetermine the custody conditions imposed by the Service in this case.  *See* 8 C.F.R. § 3.19(h)(2)(i)(D) (2001).

## III.  STATUTE AT ISSUE

The question before us involves the interpretation of section 236(c) of the Act, which provides, in relevant part, as follows:

(1)  CUSTODY.—The Attorney General shall take into custody any alien who—

(A) is inadmissible by reason of having committed any offense covered in section 212(a)(2),

(B) is deportable by reason of having committed any offense covered in section 237(a)(2)(A)(ii), (A)(iii), (B), (C), or (D),

(C) is deportable under section 237(a)(2)(A)(i) on the basis of an offense for which the alien has been sentence[d] to a term of imprisonment of at least 1 year, or

(D) is inadmissible under section 212(a)(3)(B) or deportable under section 237(a)(4)(B),

when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.

(2) RELEASE.—The Attorney General may release an alien described in paragraph (1) only if the Attorney General decides . . . that release of the alien from custody is necessary [for certain witness protection matters], and the alien satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding. A decision relating to such release shall take place in accordance with a procedure that considers the severity of the offense committed by the alien.

## IV.  ISSUE PRESENTED

The first paragraph of section 236(c) of the Act directs the Attorney General to assume custody over certain categories of criminal and terrorist aliens. The second paragraph of section 236(c) governs the "release" of these aliens. It specifies that the Attorney General may release "an alien described in paragraph (1)" only if certain strict conditions are met. The mandatory detention aspects of the statute, therefore, derive from the language of section 236(c)(2). Consequently, we must determine whether the respondent is "an alien described in paragraph (1)" of section 236(c), even though he was not immediately taken into custody by the Service when he was released from his criminal custody.

In order to resolve the issue before us, we must determine whether an "alien described in paragraph (1)" is a statutory reference to any alien who falls simply within the discrete language of subparagraphs (A), (B), (C), or (D), or whether it additionally refers to an alien who is taken into Service custody "when the alien is released." In other words, we must determine whether or not the phrase "when the alien is released" is a necessary part of the description of the alien in paragraph (1).

The respondent has not disputed that he is deportable by reason of having committed an offense covered in sections 237(a)(2)(A)(iii) and (B)(i) of the Act. In addition, the record reflects that he was released from criminal custody after the expiration on October 8, 1998, of the Transition Period Custody Rules ("TPCR"), which were enacted by section 303(b)(3) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546, 3009-586 ("IIRIRA"). *See Matter of Adeniji*, Interim Decision 3417 (BIA 1999) (holding that section 236(c) requires mandatory detention of a criminal alien only if he or she is released from

criminal custody after October 8, 1998, the last day that the TPCR were in effect).

In *Matter of Adeniji*, *supra*, we did not address the question whether section 236(c)(2) directs mandatory detention only if the Service immediately takes custody of the alien "when the alien is released" from criminal incarceration (the "when released" language). *Id.* at 8. We did note, however, that the effect of the "when released" clause would appear to be of concern principally in the case of an alien who was released after the expiration of the TPCR, but who was not promptly taken into Service custody. *Id.* at 8-9 n.2. This is such a case.

## V. PRINCIPLES OF STATUTORY CONSTRUCTION

Proper statutory construction must begin with the words used by Congress. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 431 (1987). We must start with the language of the statute, and the words should be given their "'ordinary or natural'" meaning. *Bailey v. United States*, 516 U.S. 137, 145 (1995) (quoting *Smith v. United States*, 508 U.S. 223, 228-29 (1993)); *INS v. Phinpathya*, 464 U.S. 183, 189 (1984). Where the language of the statute is clear, the inquiry is ended. The unambiguously expressed intent of Congress must be given effect. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984). However, if an ambiguity is perceived when a provision is read in isolation, it is often clarified when it is interpreted in the context of the remainder of the statutory scheme. *Bailey v. United States*, *supra*, at 146; *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988). The meaning assigned to statutory language should be the one that emerges from a reading of the statute as a whole, taking into account its object and policy. *John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*, 510 U.S. 86, 94-95 (1993).

In the context of this case, the literal language of section 236(c)(2) of the Act, which provides for the detention of "an alien described in paragraph (1)," does not unambiguously tell us whether it encompasses the "when the alien is released" clause in section 236(c)(1) or merely references the four categories of aliens described in subparagraphs (A) through (D). We find the statutory provision, when read in isolation, to be susceptible to different readings. We therefore find it necessary to examine more than the language in question, and we turn in part to the remainder of the statutory scheme, taking into account its objectives and policy in order to resolve the issue before us. *See Bailey v. United States*, *supra*; *John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*, *supra*.

## VI.  BOARD INTERPRETATION OF SECTION 236(c)
## OF THE ACT

### A.  Ordinary Meaning

The natural reading of the statutory language of section 236(c)(2) of the Act is not without importance, even though more than one reading may be permissible.  The statutory reference to "an alien described in paragraph (1)" seems to us most appropriately to be a reference to an alien described by one of four subparagraphs, (A) through (D).  The "description" of the alien does not naturally appear to include any or all of the concluding clauses of paragraph (1), namely the clauses directing that a described alien be taken into custody "when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense."

In *Matter of Noble*, 21 I&N Dec. 672 (BIA 1997), we analyzed the "when released" clause contained in the TPCR.  We concluded that this statutory language imposed a duty on the Service to assume the custody of certain criminal aliens and specified the point in time at which that duty arises.  In other words, we read the phrase "when the alien is released" in the TPCR as modifying the command that the "Attorney General shall take into custody" certain criminal aliens by specifying that it be done "when the alien is released" from criminal incarceration.

The structure of section 236 is identical, in this respect, to the structure of the TPCR.  The "when released" clause is no more a part of the *description* of an alien who is subject to detention than are the other concluding clauses.  Those other concluding clauses simply make it plain that the duty to detain is not affected by the character of an alien's release from criminal incarceration or the possibility that an alien may be rearrested on criminal charges.  All of these concluding clauses, including the "when released" clause, address themselves to the statutory command that the "Attorney General shall take into custody" certain categories of aliens, rather than to the description of those categories.

### B.  Overall Statutory Context

The other statutory provisions pertaining to the removal process place no importance on the timing of an alien's being taken into custody by the Service.

A number of the amendments made by the IIRIRA were aimed at expediting the removal of aliens, and that is especially true for criminal aliens such as those who fall within subparagraphs (A) through (D) of section 236(c)(1) of the Act.  For example, Congress made various forms of relief unavailable to criminal aliens and significantly restricted judicial review for criminal aliens.  *See, e.g.*, section 240A(a)(3) of the Act, 8 U.S.C. § 1229b(a)(3) (Supp. V 1999) (barring

permanent residents convicted of aggravated felonies from eligibility for cancellation of removal); section 242(a)(2)(C) of the Act, 8 U.S.C. § 1252(a)(2)(C) (Supp. V 1999) (restricting judicial review for certain criminal aliens).

There is no connection in the Act between the timing of an alien's release from criminal incarceration, the assumption of custody over the alien by the Service, and the applicability of any of the criminal charges of removability. Furthermore, the Act does not tie an alien's eligibility for any form of relief from removal to the timing of the alien's release from incarceration and the assumption of custody by the Service. In other words, the "when released" issue is irrelevant for all other immigration purposes. The changes made by the IIRIRA to expedite removal are not limited to aliens coming into Service custody immediately upon release from criminal incarceration. Instead, the amendments made by the IIRIRA cover criminal aliens regardless of when they were released from criminal confinement and regardless of whether they had been living within the community for years after their release.

We understand, in this regard, that Congress was frustrated with the ability of aliens, and particularly criminal aliens, to avoid deportation if they were not actually in Service custody when their proceedings were completed. *See* S. Rep. No. 104-48 (1995) (stating that many criminal aliens who are released pending deportation never appear for their proceedings, and that some criminal aliens abscond after being issued a final order of deportation); 141 Cong. Rec. S7803, S7823 (daily ed. June 7, 1995) (statement of Sen. Abraham); *see also Ofosu v. McElroy*, 98 F.3d 694, 702 (2d Cir. 1996) (stating that released aliens who abscond calculate correctly that the Service lacks the resources to conduct a dragnet). The statute does direct the Attorney General to take custody of aliens immediately upon their release from criminal confinement. But Congress was not simply concerned with detaining and removing aliens coming directly out of criminal custody; it was concerned with detaining and removing *all* criminal aliens.

In sum, we discern that the statute as a whole is focused on the removal of criminal aliens in general, not just those coming into Service custody "when . . . released" from criminal incarceration. The objectives and design of the statute as a whole are therefore not consistent with reading the "when released" clause as being part of the meaning of "an alien described in paragraph (1)," as that phrase is understood in section 236(c)(2) of the Act.

## C. Predecessor Provisions

The history of the statutory mandate to detain criminal aliens does not indicate to us that Congress had a different meaning in mind, even though various predecessor provisions contained ambiguous language similar to the provision we interpret today. Mandatory detention was first introduced in the

Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, 102 Stat. 4181 ("ADAA"). *See* ADAA § 7343, 102 Stat. at 4470. The ADAA added former section 242(a)(2) of the Act, 8 U.S.C. § 1252(a)(2) (Supp. I 1989), which provided as follows:

> The Attorney General shall take into custody any alien convicted of an aggravated felony *upon completion of the alien's sentence for such conviction.* Notwithstanding subsection (a), the Attorney General shall not release such felon from custody. (Emphasis added.)

The second sentence of this statute mandated the detention of any "such felon," which could readily be understood as "any alien convicted of an aggravated felony." Nevertheless, the "upon completion" clause of this original provision raises uncertainty as to the scope of its coverage that is comparable to the uncertainty raised by the "when released" clause in the present statute. Similar uncertainty exists in amendments made by section 440(c) of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214, 1277 ("AEDPA"), further amended by section 306(d) of the IIRIRA, 110 Stat. at 3009-612, as well as in section 303(b)(3) of the IIRIRA, 110 Stat. at 3009-586, which gave us the TPCR. These statutory changes are not of substantial guidance.

However, former section 242(a)(2) was amended, in a manner that we find instructive, by section 504 of the Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978, 5049 ("1990 Act"), and by section 306(a)(4) of the Miscellaneous and Technical Immigration and Naturalization Amendments of 1991, Pub. L. No. 102-232, 105 Stat. 1733, 1751 (effective as if included in the 1990 Act). Section 242(a)(2) of the Act, as amended by these 1990 and 1991 enactments, provided as follows:

> (A) The Attorney General shall take into custody any alien convicted of an aggravated felony upon release of the alien (regardless of whether or not such release is on parole, supervised release, or probation, and regardless of the possibility of rearrest or further confinement in respect of the same offense). Notwithstanding paragraph (1) or subsections (c) and (d) but subject to subparagraph (B), the Attorney General shall not release such felon from custody.

> (B) The Attorney General may not release from custody any lawfully admitted alien who has been convicted of an aggravated felony, either before or after a determination of deportability, unless the alien demonstrates to the satisfaction of the Attorney General that such alien is not a threat to the community and that the alien is likely to appear before any scheduled hearings.

We find this version of the statute to be particularly instructive. This version separates the provision requiring the Attorney General to assume the custody of aliens coming out of criminal incarceration from the provision governing the release of criminal aliens. Subparagraph (A) includes the "upon release of the

alien" language that is comparable to the "when released" clause of the current statute. It requires the Attorney General to assume custody of criminal aliens at the time of their release from criminal custody.

Subparagraph (B), however, specifies that the Attorney General may not release "any lawfully admitted alien who has been convicted of an aggravated felony" unless certain conditions are met. Importantly, those conditions extended to *all* aliens convicted of aggravated felonies, regardless of whether the aliens actually came into Service custody "upon release" from criminal incarceration. In other words, the groups of criminal aliens subject to mandatory detention were not affected by the timing of their release from criminal custody or the timing of the Service's acquisition of custody. Under this provision, all aliens convicted of aggravated felonies who had *not* been lawfully admitted were subject to mandatory detention.

In sum, the statute has contained different phrases over the years, from "upon completion of the alien's sentence" to "upon release of the alien" to "when the alien is released." Some of the statutory versions contain the ambiguity we face now. But the version stemming from the 1990 and 1991 amendments does not. That version is strong evidence that Congress was not attempting to restrict mandatory detention to criminal aliens taken immediately into Service custody at the time of their release from a state or federal correctional institution.

## D. Practical Considerations

In *Matter of Noble*, *supra*, at 681-82, we identified a variety of practical considerations affecting the statutory analysis, some of which apply to this case as well. We see no need to repeat that discussion here. *Id.* at 679-82. We merely observe that these practical concerns reinforce the reading that emerges from the structure of the statute as a whole and from the history of the mandatory detention provision itself.

There are, however, additional analytical problems arising from the respondent's interpretation of the "when released" clause. For example, it is not clear where the line would be drawn under his reading of the statute. Would mandatory detention apply only if an alien were literally taken into custody "immediately" upon release, or would there be a greater window of perhaps 1 minute, 1 hour, or 1 day?

Such questions are not relevant to any other aspect of removal proceedings. It would therefore be inconsistent with our understanding of the statutory design to construe section 236(c) of the Act in a way that permits the release of some criminal aliens, yet mandates the detention of others convicted of the same crimes, based on whether there is a delay between their release from criminal custody and their apprehension by the Service.

## E.  Summary

We construe the phrasing "an alien described in paragraph (1)," as including only those aliens described in subparagraphs (A) through (D) of section 236(c)(1) of the Act, and as not including the "when released" clause.  Our interpretation is derived from the natural meaning of the statutory language, from the object and design of the statute as a whole, and from the history of the mandatory detention provisions.  It is reinforced by practical concerns that would otherwise arise.

## VII.  JUDICIAL RESPONSE TO *MATTER OF NOBLE*

The federal district courts appear to be divided on our interpretation of the TPCR in *Matter of Noble*, *supra*.  Our analysis has been rejected by several district courts that have followed the lead taken in *Pastor-Camarena v. Smith*, 977 F. Supp. 1415 (W.D. Wash. 1997).  *See, e.g.*, *Alikhani v. Fasano*, 70 F. Supp. 2d 1124 (S.D. Cal. 1999); *Aguilar v. Lewis*, 50 F. Supp. 2d 539 (E.D. Va. 1999); *Alwaday v. Beebe*, 43 F. Supp. 2d 1130 (D. Or. 1999); *Rivera v. Demore*, No. C 99-3042 TEH, 1999 WL 521177 (N.D. Cal. July 13, 1999); *Grodzki v. Reno*, 950 F. Supp. 339 (N.D. Ga. 1996); *see also Grant v. Zemski*, 54 F. Supp. 2d 437 (E.D. Pa. 1999); *Velasquez v. Reno*, 37 F. Supp. 2d 663 (D.N.J. 1999).  The respondent relies heavily on the reasoning of *Pastor-Camarena v. Smith* and on other district court decisions that have followed its approach.

We do not agree with the *Pastor-Camarena* court's reasoning.  The petitioner in that case had argued that immigration law historically distinguished between persons taken into custody from the community at large and those taken into custody directly upon release from the criminal justice system.  In rejecting *Noble's* reading of the statute, the court appeared to accept the petitioner's "historical" argument by pointing to the "upon release" clause in former section 242(a)(2) of the Act, as amended by section 440(c) of the AEDPA.[1]  The court found that the plain meaning of the phrase "upon release of the alien from

---

[1]  Former section 242(a)(2), as amended by section 440(c) of the AEDPA and by section 306(d) of the IIRIRA, provided as follows:

> The Attorney General shall take into custody any alien convicted of any criminal offense covered in section 241(a)(2)(A)(iii), (B), (C), or (D), or any offense covered by section 241(a)(2)(A)(ii) for which both predicate offenses are, without regard to the date of their commission, otherwise covered by section 241(a)(2)(A)(i), *upon release of the alien from incarceration*, shall deport the alien as expeditiously as possible.  Notwithstanding paragraph (1) or subsections (c) and (d), the Attorney General shall not release *such felon* from custody.  (Emphasis added.)

incarceration" is that it applies only to aliens "immediately after release from incarceration, not to aliens released many years earlier." *Pastor-Camarena v. Smith*, *supra*, at 1417.

The court in *Pastor-Camarena* accepted an incorrect "historical" argument. Our earlier discussion of former section 242(a)(2) of the Act, after the 1990 and 1991 amendments, demonstrates that the statute was focused on the detention of certain aliens convicted of aggravated felonies and not on the timing of when they came into Service custody. Moreover, the structure of former section 242(a)(2), as amended by the AEDPA, is largely the same as it was after the 1990 and 1991 amendments. The principal difference, for our purposes, is that section 440(c) of the AEDPA eliminated subparagraph (B), which had authorized bond for aliens convicted of aggravated felonies if those aliens had been lawfully admitted. It is the second sentence of former section 242(a)(2), as amended by the AEDPA, that contains the mandatory detention requirement, and it applies to "such felon."

We read "such felon" as describing those aliens convicted of the covered criminal offenses, just as it had similarly described an "alien convicted of an aggravated felony" in the version of the statute preceding the AEDPA amendments. We do not read the term "such felon" as also including the "upon release" clause. Rather, as set forth in *Matter of Noble*, *supra*, we read the "upon release" clause as a direction pertaining to when the duty arises to take the alien into custody. Indeed, the structure of the statute after the 1990 and 1991 amendments clarifies that "such felon" is a reference to an alien "convicted of an aggravated felony" and, importantly, that it is *not* also a reference to the "upon release" clause. The analysis in *Pastor-Camarena* and the decisions that follow a similar approach do not, therefore, lead us to reject the interpretation that we otherwise find appropriate in view of the statute as a whole.

Moreover, other courts have upheld the analysis set forth in *Matter of Noble*. *See Saucedo-Tellez v. Perryman*, 55 F. Supp. 2d 882 (N.D. Ill. 1999) (deferring to *Noble* and concluding that the mandatory detention provision in section 236(c) of the Act includes aliens released from criminal custody after the TPCR expired who are later detained by the Service); *see also Okeke v. Pasquarell*, 80 F. Supp. 2d 635 (W.D. Tex. 2000) (agreeing with *Noble* that "when the alien is released" specifies the time at which the duty to detain a criminal alien arises).

As noted by the dissent, some district courts have found mandatory detention to be unconstitutional. However, even the dissent's construction of the statute would not eliminate the constitutional concerns raised in those decisions. Rather, the dissent's approach would merely reduce the number of aliens who are subject to mandatory detention. The dissent also relies on a line of district court cases that conclude that section 236(c) of the Act and its predecessors do not apply retroactively to aliens released from criminal custody prior to the date of enactment of the relevant mandatory detention provisions. We are not,

however, applying section 236(c) to aliens who were released from criminal custody prior to the date on which the provision went into effect. We have previously determined that such aliens are beyond the reach of section 236(c). *See Matter of Adeniji*, *supra* (holding that section 236(c) of the Act does not apply to aliens released from criminal custody prior to the expiration of the TPCR on October 8, 1998).

## VIII. CONCLUSION

We find that the respondent is subject to mandatory detention pursuant to section 236(c) of the Act, despite the fact that he was not taken into Service custody immediately upon his release from state custody. The regulations do not give Immigration Judges bond jurisdiction over aliens who are properly subject to mandatory detention. *See* 8 C.F.R. § 3.19(h)(2)(i)(D). Accordingly, the Immigration Judge properly determined that he did not have jurisdiction to redetermine the custody conditions imposed by the Service in this case. *See Matter of Adeniji*, *supra*. The respondent's appeal will be dismissed.

**ORDER:** The appeal is dismissed.


*CONCURRING AND DISSENTING OPINION*: Anthony C. Moscato, Board Member, in which Gustavo D. Villageliu, Board Member, joined

I respectfully concur in part and dissent in part.

I concur in the result reached by the majority and find that the respondent is subject to mandatory detention pursuant to section 236(c) of the Immigration and Nationality Act, 8 U.S.C. § 1226(c) (Supp. V 1999). However, I disagree with the analysis used by the majority to reach that conclusion.

In several recent decisions, this Board has considered the impact of what has come to be called the "when released" clause. This clause was directly considered in *Matter of Noble*, 21 I&N Dec. 672 (BIA 1997), tangentially considered in *Matter of Adeniji*, Interim Decision 3417 (BIA 1999), and *Matter of West*, Interim Decision 3438 (BIA 2000), and is once again considered directly in the instant case. In *all* of those decisions, including both the majority and dissenting opinions here, the Board has proceeded—virtually as a given—on the premise that the "when released" clause modifies the verb phrase "*shall take into custody.*" Section 236(c)(1) of the Act.

As a result of that conclusion, we have been left with a difficult question: does the "when released" clause, as it modifies the verb phrase "shall take into custody," *require* that the Attorney General (or his delegate, the Immigration and Naturalization Service) be literally at the jailhouse door to take custody at the instant of release in order to create an alien "described in paragraph (1)" for purposes of mandatory detention, as set forth in section 236(c)(2) of the Act?

The dissent asserts that this is precisely the meaning and the required result. The majority engages in a lengthy legal and historical analysis of predecessor provisions to demonstrate, in the end, that the language of the Miscellaneous and Technical Immigration and Naturalization Amendments of 1991, Pub. L. No. 102-232, 105 Stat. 1733, demonstrates that the "when released" clause, as it modifies the words "shall take into custody," does not require the taking of an alien into custody at the instant of release.

It is difficult to conclude that Congress meant to premise the success of its mandatory detention scheme on the capacity of the Service to appear at the jailhouse door to take custody of an alien at the precise moment of release. It was, as the majority documents, primarily its frustration with the Service's inability to achieve the deportation of aliens not in detention that led Congress to create this scheme in the first place. It therefore does not seem likely that Congress would have based the success of its newly created scheme on a requirement that the Service perform at a very high level of efficiency. Nor do I believe that Congress did so.

Proper statutory construction must begin with the words used by Congress. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 431 (1987). Where the language of the statute is clear, the inquiry is ended. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984). The language of this statute is clear.

The text of section 236(c) of the Act is set forth below, divided into sections by parentheses for ease of reference:

DETENTION OF CRIMINAL ALIENS.—
   (1) CUSTODY.—
   [1](The Attorney General shall take into custody)

   [2](any alien who — (A) is inadmissible by reason of having committed any offense covered in section 212(a)(2)[1182], (B) is deportable by reason of having committed any offense covered in section 237(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) [1227], (C) is deportable under section 237(a)(2)(A)(i) on the basis of an offense for which the alien has been sentence[d] to a term of imprisonment of at least 1 year, or (D) is inadmissible under section 212(a)(3)(B) or deportable under section 237(a)(4)(B),)

   [3](when the alien is released),

   [4](without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.)

In general, English usage seeks to place the modifier as close to the object being modified as possible. To achieve the conclusion reached by the majority and the dissent, section 3 above must leap over the lengthy section 2, which

defines the categories of aliens subject to mandatory detention, in order to modify section 1. This is possible, but less than likely.

It is more likely that Congress meant to do something simpler and clearer, namely, to make section 3 modify the section immediately preceding and abutting it, section 2. Read in this fashion, we find the following:

(1) If, when the alien is released (section 3), he or she falls into one of the four categories, (A)-(D) (section 2), the Attorney General shall take the alien into custody (section 1). That's it. Under this reading, it doesn't matter when the Service takes an alien into custody—at the time of release, the next day, 2 months later, or 5 years later.

(2) The "when released" clause thus serves two clear purposes in defining an alien who is subject to mandatory detention: a) it requires that the alien fall into one of the four defined categories *when he or she is released*; and b) it limits the definition of an alien subject to mandatory detention to one who has been "released." Thus, the Attorney General may not assume custody until the state has "released" the alien from incarceration.

(3) Finally, the remainder of the statute, encompassed by section 4, modifies the last word of section 3, "released," and asserts that the form of release is irrelevant. In essence, while the definition of an alien subject to mandatory detention *does not include* one who is incarcerated (see paragraph 2, above), it *does include* an alien who has been released from incarceration but is still subject to the other, lesser controls of federal or state criminal correctional systems.

If we adopt this reading, which comports more closely with preferred English usage, each word and clause in the section has its natural meaning, and each works together to create a clear and harmonious whole—a whole that supports the overall statutory intent to place aliens who fall into certain categories into mandatory detention. In addition, we are rid of the difficult issue regarding the temporal reach of the "when released" language; it simply disappears if the "when released" clause does not modify the verb phrase.

Finally, it has been suggested that there are serious due process concerns regarding both mandatory detention, in general, and the broad scheme of mandatory detention set forth here, in particular. *See Matter of Rojas*, 23 I&N Dec. 117 (BIA 2001) (Rosenberg, dissenting). That may well be true. Mandatory detention, especially when it is imposed within the immigration law—a system that is clearly *civil* in nature—must always be the subject of concern and, where appropriate, be subject to limited application. However, as discussed above, Congress has spoken clearly on this matter. This statute can fairly be read, according to the plain meaning of the words and usages employed, to require mandatory detention, without any requirement that the Service take an alien into custody at the moment of release.

In light of that clarity, and the extraordinary deference paid by the United States Supreme Court to the plenary authority of Congress in the area of immigration, it is beyond the authority of this Board to consider the due process concerns generated by mandatory detention.

*DISSENTING OPINION*: Lory Diana Rosenberg, Board Member, in which Paul W. Schmidt, John Guendelsberger, Neil P. Miller, Noel A. Brennan, Cecelia M. Espenoza, and Juan P. Osuna, Board Members, joined

I respectfully dissent.

The ultimate issue before us is whether the respondent can obtain a change in immigration custody status or whether he must remain in immigration detention during the entire time that removal proceedings are pending against him. *See* section 236(c) of the Immigration and Nationality Act, 8 U.S.C. § 1226(c) (Supp. V 1999). The resolution of that question depends on whether the respondent is "*an alien described in* paragraph (1)" who is subject to mandatory detention due to a criminal offense, despite the fact he was not taken into custody by the Attorney General when he was released from criminal incarceration. Section 236(c)(2) of the Act (emphasis added).

The majority concludes that, under the statute, the respondent is ineligible for a change in custody status because the phrase "when the alien is released [from criminal incarceration]" should not have any bearing on our interpretation of which aliens are affected by section 236(c) of the Act. I disagree.

The resolution reached by the majority is based on a flawed construction of section 236(c). Our interpretation of the statute must include consideration of the phrase "when the alien is released" as an integral part of paragraph (1). That phrase is part of the statutory *description* identifying the aliens whom the Attorney General must take into custody and may not release. We do not need to resort to contortions concerning what "described in" means to obtain a rational interpretation of the plain terms of this statute. I conclude that the statutory language does not mandate that this respondent *necessarily* remain detained, as he is not an alien described in paragraph (1) of section 236(c) of the Act. Accordingly, I would remand this case to determine whether the respondent's continued detention is warranted.

## I. STATUTORY LIMITATION ON CHANGE IN IMMIGRATION CUSTODY STATUS

The respondent is a lawful permanent resident who was convicted of possession with intent to sell cocaine and sentenced to a period of criminal incarceration. He is charged with being deportable under sections

237(a)(2)(A)(iii) and (B)(i) of the Act, 8 U.S.C. §§ 1227(a)(2)(A)(iii) and (B)(i) (Supp. V 1999), and is subject to removal, but he has not been found removable. When he was released from incarceration, he was not taken into custody by the Immigration and Naturalization Service, but was returned to the community.

As I indicated in my separate opinion in *Matter of Adeniji*, Interim Decision 3417 (BIA 1999) (Rosenberg, concurring and dissenting), the language used by Congress in section 236(c) of the Act does not expressly mandate the detention of every alien who has ever committed a criminal or terrorist offense. *Id.* at 27-28; *see also Matter of Noble*, 21 I&N Dec. 672, 695-99 (BIA 1997) (Rosenberg, concurring and dissenting) (addressing the effect of similar language in the Transition Period Custody Rules ("TPCR")). The legislative mandate to detain is limited to those aliens who are taken into immigration custody when released from criminal incarceration. *Id.*

Detention on the basis that an alien is subject to certain removal charges under the Act constitutes a deprivation of liberty. If such a restriction can be required at all, it must be imposed only in strict compliance with the statutory mandate, which must be regulatory and not punitive in purpose. *See United States v. Salerno*, 481 U.S. 739, 747 (1987) ("[T]he punitive/regulatory distinction turns on "' whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it].""" (quoting *Schall v. Martin*, 467 U.S. 253, 269 (1984) (quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963)))). Applying *United States v. Salerno*, *supra*, section 236(c) will be upheld if the statute is regulatory in nature and not excessive to its purpose. *Welch v. Reno*, 101 F. Supp. 2d 347, 353-55 (D. Md. 2000) (citing *United States v. Salerno*, *supra*, at 747).

However, the fact that detention is not mandatory does not mean that an alien cannot be held in immigration custody based on an individual examination of the factors warranting such a deprivation. It is undisputed that we retain ample authority to require detention based on case-by-case determinations, when release from the custody of the Service is not warranted.

## A. Interpretation of the Statutory Language

Section 236(c) of the Act has two paragraphs. The first paragraph requires the Attorney General to take into custody any alien who is inadmissible or deportable due to specified criminal or terrorist offenses "*when the alien is released*, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense." Section 236(c)(1) of the Act (emphasis added). The second paragraph governs the restriction on the Attorney General's authority to consider an alien for release from immigration custody.

With few exceptions not relevant here, that authority depends on whether the alien is *an alien described in paragraph (1). See* section 236(c)(2) of the Act.

There can be no real dispute over whether the specific language "*when the alien is released*" is a part of the text of paragraph (1) of section 236(c). Section 236(c)(1) of the Act (emphasis added). Likewise, there can be no disagreement that "*an alien described in paragraph (1)*" is subject to mandatory immigration custody and, with extremely limited exceptions, must remain in such custody. Section 236(c)(2) of the Act. Therefore, we must interpret whether the scope of the reference to "*an alien described in*" in section 236(c)(2) includes consideration of "*when the alien is released*" in the text of section 236(c)(1).

This language is plain. In *Matter of Noble*, *supra*, the Board ruled that "[o]ur reading comports with a 'plain meaning' statutory construction and is wholly consistent with congressional intent." *Id*. at 678; *see also id.* at 690 (Rosenberg, concurring and dissenting) (agreeing that the language is plain, but challenging the majority's interpretation of the language in the TPCR and in section 236(c) of the Act). As I have asserted consistently, the context in which this "when released" language appeared in the TPCR, as well as the context in which it appears in the present statute, supports reading these words as referring to the time of an alien's release from criminal incarceration. *Id.* at 695-96; *see also K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988).

The entirety of paragraph (1) is a directive from Congress to the Attorney General. The principal sentence of the section reads, "The Attorney General *shall take into custody*," and then proceeds to describe those aliens who shall be taken into custody. Section 236(c)(1) of the Act (emphasis added). A straightforward reading of this section reflects that paragraph (1) is a mandate. The text following the principal clause refers to the aliens whom the Attorney General shall take into custody when they are released from criminal incarceration. In other words, the paragraph describes which inadmissible or deportable aliens are to be taken into custody by the Attorney General when such aliens are released from criminal incarceration. *See* section 236(c)(1) of the Act.

The word "'when' [is defined] as 'just after the moment that.'" *Alikhani v. Fasano*, 70 F. Supp. 2d 1124, 1130 (S.D. Cal. 1999) (quoting *Webster's Third New International Dictionary* 2602 (3d ed. 1976)). Therefore, as one court noted, the clear language of the statute requires that "the mandatory detention of aliens 'when' they are released requires that they be detained at the time of release." *Alikhani v. Fasano*, *supra*, at 1130; *see also Velasquez v. Reno*, 37 F. Supp. 2d 663, 672 (D.N.J. 1999) ("This court cannot simply ignore the plain language of the statute which provides that an alien is to be taken into custody 'when the alien is released.'"). As another court noted, "Congress could have required custody 'regardless of when the alien is released' or 'at any time after the alien is released,'" but did not do so. *Alwaday v. Beebe*, 43 F. Supp. 2d

132

1130, 1133 (D. Or. 1999) (citing *Pastor-Camarena v. Smith*, 977 F. Supp. 1415, 1417-18 (W.D. Wash. 1997) (finding it "arbitrary and capricious . . . to interpret the phrase ['when the alien is released'] to include [persons] . . . who were released from incarceration many years before coming into the custody of the INS for deportation proceedings")). Yet another court found that "[s]ince Rivera was released from state criminal incarceration in April 1995, over three years *before* he was taken into custody by the INS in May 1998, the prohibitions on release of aliens taken into custody under section 236(c)(1) do not apply to him." *Rivera v. Demore*, No. C99-3042-TEH, 1999 WL 521177, at *4 (N.D. Cal. July 13, 1999). These courts have concluded uniformly that "[t]he plain meaning of this language is that it applies immediately after release from incarceration, not to aliens released many year[s] earlier." *Pastor-Camarena v. Smith*, *supra*, at 1417-18 (citing *Grodzki v. Reno*, 950 F. Supp. 339, 342 (N.D. Ga. 1996); *Montero v. Cobb*, 937 F. Supp. 88 (D. Mass. 1996)).

Nevertheless, the majority proposes that there is a question as to whether the "when . . . released" phrase in paragraph (1) should be given any effect at all in interpreting the scope of the limitation on the Attorney General's authority to release some aliens from such custody under paragraph (2). *See Matter of Rojas*, 23 I&N Dec. 117 (BIA 2001). The majority claims that in interpreting the scope of the Attorney General's authority to release certain aliens from custody under paragraph (2) of section 236(c) of the Act, "we must determine whether an 'alien *described in* paragraph (1)' . . . *additionally refers* to an alien who is taken into Service custody 'when the alien is released.'" *Id*. at 119 (emphasis added).

The term "described in" is not a novel reference. Most recently, in *Matter of Vasquez-Muniz*, Interim Decision 3440 (BIA 2000), we construed the use of the phrase "described in" in the aggravated felony definition to refer to another federal statute. We found it to be defined in common usage as "[t]o represent by words written or spoken; . . . to state in detail the particulars of." *Id*. at 7 (quoting *Webster's New International Dictionary* 706 (2d ed. 1959)). We found that "[e]ach usage of the phrase 'described in' . . . clearly refers to *something specifically set forth elsewhere in the statute* or regulation." *Id*. at 8 (emphasis added). Paragraph (1) of section 236(c) specifically sets forth the description of aliens who are subject to mandatory custody when they are released from criminal incarceration.

The majority's characterization of the issue strains credulity. The statute does not present the language "when the alien is released" as some adjunct to the statute, but as a component part. Nevertheless, the majority contends that there is a question whether the phrase "'when the alien is released' is *a necessary part* of the description of the alien in paragraph (1)." *Matter of Rojas*, *supra*, at 119 (emphasis added). Pared down to its basics, the majority opinion holds that "'when the alien is released' is *[not] a necessary part* of the description of the alien in paragraph (1)." *Id.* (emphasis added).

It is not our role to determine whether particular language used by Congress is "necessary." It is our role to implement the statute Congress enacted according to the intent of Congress that is expressed by the language Congress used. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984). Indeed, we have previously acknowledged that "it is assumed that the legislative purpose is expressed by the ordinary meaning of the words . . . [and] [t]he language of the statute must ordinarily be regarded as conclusive . . . ." *Matter of Noble*, *supra*, at 677 (citing *INS v. Cardoza-Fonseca*, 480 U.S. 421, 446 (1987)); *see also Matter of M/V Signeborg*, 9 I&N Dec. 6, 7-8 (BIA 1960) (holding that "the language of the law cannot be enlarged beyond the ordinary meaning of its terms").

"An alien described in paragraph (1)" is an alien who comes within the language used by Congress in paragraph (1), i.e., an alien who is inadmissible or deportable under a section of the Act and who is taken into custody upon release from incarceration. This paragraph describes the particular aliens whom the Attorney General is bound to detain. Language should not be construed in a way that renders a term surplusage. *United States v. Menasche*, 348 U.S. 528 (1955). It is simply splitting hairs to assert, as the majority does, that the portion of the paragraph referring to when the designated inadmissible and deportable aliens are to be taken into custody is not part of the description of which aliens are to be detained without possibility of release.[1]

Where Congress' intent is clearly expressed in the language it uses, it must be given effect. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, *supra*, at 842-43. Yet the majority resorts to the same argument it asserted in *Matter of Noble*, *supra*, contending here that "[t]he 'when released' clause is no more a part of the *description* of an alien who is subject to detention than are the other concluding clauses . . . [which] address themselves to the statutory command that the 'Attorney General shall take into custody' certain categories of aliens, rather than to the description of those categories." *Matter of Rojas*, *supra*, at 121; *cf. Matter of Noble*, *supra*, at 680. Not

---

[1] Likewise, the phrase "when the alien is released" is not merely a temporal signpost indicating that for the Attorney General to hold an alien in mandatory custody, the alien must have been subject to removal on one or more of the referenced grounds at the particular time he or she actually was released from criminal incarceration. If an alien is not inadmissible or deportable on one of those grounds at the time he or she is released from criminal incarceration, the Service rarely would have jurisdiction to take him or her into custody and charge him or her with being subject to removal. Therefore, it goes without saying that inadmissibility or deportability must at least be colorable at the time the alien is released from criminal incarceration. To limit the reading of the statute in any other way would simply be redundant.

surprisingly, the majority fails to provide any reason why characterizing the language as a directive makes it any less a description, particularly when that description is communicated as part of a mandate to the Attorney General.

As I have demonstrated, *all* of paragraph (1) is a directive to the Attorney General to take the described aliens into custody. Paragraph (2) refers to all of these aliens. We have emphasized that in the absence of "clearly expressed legislative intention . . . any *inferences* . . . are insufficient to override the literal language of the statute . . . . [W]e are not at liberty to rewrite the literal language . . . and any changes to the express language must be left to Congress." *Matter of Noble*, *supra*, at 685-86. The majority ignores its own words in concluding that the "when . . . released" phrase is not necessary to the reading of paragraph (1) and is not part of a description of the aliens whom the Attorney General must detain.

## B. Prior Federal Court Decisions

The majority of the federal district courts that have considered the language at issue under one or another of the statutory enactments invoking such language have not adopted the interpretation advocated by the majority. Although some courts have concluded that mandatory detention is permissible, none has expressly agreed that "when the alien is released" is not necessary to an interpretation of the statute and is not a part of the description of which aliens are to be held in custody upon their release from incarceration.

The majority addresses the federal district court's decision in *Pastor-Camarena v. Smith*, *supra*, as though it were the only federal court decision to contain a significant analysis in opposition to that adopted here by the majority. However, prior to 1997, numerous courts held that the language "upon release of the alien from incarceration" meant that the statute did not apply to aliens who were both convicted and released from incarceration before the statute was enacted. *See, e.g.*, *Montero v. Cobb*, *supra*, at 95 (finding that the petitioner was entitled to a bond hearing, in part because section 440(c) of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214, 1277 ("AEDPA"), did not apply to aliens convicted and released prior to its enactment); *Grodzki v. Reno*, *supra*, at 342-43 (finding that the "upon release" language at least implies that Service custody must commence within a reasonable time after release from incarceration and the statute therefore did not apply to the petitioner, who had been released from incarceration 8 years earlier); *DeMelo v. Cobb*, 936 F. Supp. 30, 36 (D. Mass. 1996) (holding that AEDPA § 440(c) could not, by its language, apply to aliens who were convicted and released before the statute was enacted), *vacated*, 108 F.3d 328 (1st Cir. 1997) (question mooted by passage of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546 ("IIRIRA")); *Villagomez v. Smith*, No.

C96-1141C, 1996 WL 622451, at *6 (W.D. Wash. July 31, 1996) (holding that the language of AEDPA § 440(c) supported the conclusion that it did not apply to aliens convicted and released prior to its enactment).

As these decisions indicate, in enacting section 236(c) of the Act, Congress should have been aware that the "upon release" language of section 440(c) of the AEDPA was consistently being interpreted as limiting the applicability of the provision to aliens convicted and released after its enactment. "It is axiomatic that 'identical words used in different parts of the same act are intended to have the same meaning.'" *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155, 203 n.12 (1993) (quoting *Atlantic Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932)). If Congress had intended to make the statute applicable to aliens regardless of when they were released or when they were taken into custody by the Service, it could easily have included language to that effect. *See McCarthy v. Bronson*, 500 U.S. 136, 140 (1991) (presuming that Congress was familiar with judicial opinions interpreting particular language relating to the subject matter when it again selected and enacted such language); *see also Velasquez v. Reno*, *supra*, at 671; *Matter of Adeniji*, *supra*, at 28 (Rosenberg, concurring and dissenting) ("We have every reason to presume that Congress intended the same term, 'released,' to be understood similarly in each provision . . . .").

Each of the federal district court rulings addressing whether section 236(c) of the Act applies to persons released from criminal incarceration prior to October 9, 1998, struck down the interpretation of the term "released" that was suggested by our decision in *Matter of Noble*, *supra*. *See, e.g.*, *Grant v. Zemski*, 54 F. Supp. 2d 437 (E.D. Pa. 1999); *Aguilar v. Lewis*, 50 F. Supp. 2d 539 (E.D. Va. 1999); *Alwaday v. Beebe*, *supra*; *Velasquez v. Reno*, *supra*; *Miranda-Arteaga v. Reno*, CV-99-0949 (M.D. Pa. July 1, 1999); *Abdel-Fattah v. Reno*, Civ. No. 99-947 (M.D. Pa. June 28, 1999); *Alvarado-Ochoa v. Reno*, 99-0470-IEG (AJB) (S.D. Cal. May 28, 1999); *Baltazar v. Fasano*, No. 99-CV-380 BTM (S.D. Cal. Mar. 25, 1999); *Reyes-Rodriguez v. Fasano*, 99-CV-0023 (S.D. Cal. Feb. 26, 1999); *Alves-Curras v. Fasano*, 98-CV-2295 (S.D. Cal. Feb. 22, 1999). These cases all hold that the plain language "released," in both section 236(c) of the Act and section 303(b)(2) of the IIRIRA, 110 Stat. at 3009-586, applies only to aliens who are released from criminal incarceration on October 9, 1998, or a later date.

In addition, virtually every federal district court that has addressed the statute following the expiration of the transition rules has ruled that section 236(c) of the Act applies only to aliens "released" into immigration custody on October 9, 1998, or later. *See, e.g.*, *Alikhani v. Fasano*, *supra*, at 1130 (recognizing that section 236(c) "provides that the Attorney General shall take an alien who has committed certain specified crimes into custody 'when the alien is released'"). "Given the plain language of the statute, . . . § 1226(c) does not apply to aliens released from prison prior to the effective date of the statute." *Id*. (citing

*Velasquez v. Reno*, *supra*; *Alwaday v. Beebe*, *supra*); *cf. Parra v. Perryman*, 172 F.3d 954 (7th Cir. 1999). As the court in *Rivera v. Demore*, *supra*, noted, "By its terms section 236(c) gives the INS a strong incentive to detain criminal aliens immediately after their release from criminal custody: if taken into INS custody immediately, the mandatory detention rules apply, precluding the risk of flight arising from release on bond and avoiding altogether the administrative burden and expense of bond hearings. " *Id*. at \*4.

In short, the vast majority of federal district courts have universally rejected the majority's reading of the "release" language of the TPCR, which was first set forth in *Matter of Noble*, *supra*. What is more, the majority's reading has been found to be a "deviation from the plain language of section 303(b)(3)(A)." *Rivera v. Demore*, *supra*, at \*5 ("This curious interpretation is then bolstered in the [*Noble*] opinion by a rehearsal of IIRIRA's compelling purpose of providing an expedited mechanism for removing the 'growing criminal immigrant population in this country,'. . . and disbelief that Congress meant to narrow the class of criminal aliens subject to mandatory detention to those taken into custody *when released* from criminal incarceration.") (citations omitted).

## C.  Prior Board Decisions

Moreover, we do not approach the question of the scope of mandatory detention under section 236(c) of the Act in a vacuum. We previously have construed the statute in relation to an alien's release from criminal incarceration in two cases after our decision in *Matter of Noble*, *supra*. In *Matter of Adeniji*, *supra*, we held that section 236(c) requires mandatory detention of a criminal alien only if he or she is released from criminal custody after October 8, 1998, the last day that the TPCR were in effect. *See* IIRIRA § 303(b)(2) (providing that section 236(c) of the Act "shall apply to individuals released after [the expiration of the TPCR on October 9, 1998]"). To reach this result, we were forced to consider *when* the alien was released from criminal incarceration. When the alien was released from criminal incarceration played a significant part in our determination whether section 236(c) applied.

In addition, in *Matter of West*, Interim Decision 3438 (BIA 2000), we ruled that the mandatory custody rules did not apply to an alien who had been released from actual criminal incarceration in 1997, prior to the expiration of the TPCR, and who had only been subject to probation after that time. To reach that conclusion we had to construe the "released after" language in the TPCR to include aliens who might otherwise be subject to mandatory detention, but who were released before October 8, 1998. Therefore, we again considered when an alien was released from criminal incarceration in determining whether the mandatory detention provisions of section 236(c) applied.

In each of these cases, we addressed the applicability of mandatory custody provisions not merely by looking to the violations of the Act described in

section 236(c)(1) of the Act, but by reviewing the entirety of subsection (c) to determine which aliens were subject to mandatory custody and ineligible to be considered for release. Although the specific question before us is limited to the scope of section 236(c)(2), our prior interpretations clearly recognized that the factor of when an alien is released is an integral part of the mandatory custody directive in the statute. There is no basis to bifurcate the paragraph so that "when the alien is released" is somehow severed from the entirety of the paragraph, for purposes of determining which aliens the Attorney General may not release from immigration custody.

## II. STATUTORY LIMITATION IN LIGHT OF CONSTITUTIONAL CONSIDERATIONS

As I noted in my dissenting opinion in *Matter of Valdez*, 21 I&N Dec. 703 (BIA 1997), the canons of statutory construction militate in favor of a restrictive interpretation of a statutory provision "'if a broader meaning would generate constitutional doubts.'" *Id.* at 718 (Rosenberg, dissenting) (quoting *United States v. Witkovich*, 353 U.S. 194, 199 (1957)); *see also Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445-46 (1988). The interpretation advocated by the majority raises serious constitutional doubts concerning the statute as applied to the respondent.

The Board does not have jurisdiction to address constitutional issues. However, we certainly may take note of constitutional issues in construing statutory provisions. The encroachment on the liberty interests of an alien deemed to be subject to mandatory detention raises questions of constitutional magnitude. *See Cabreja-Rojas v. Reno*, 999 F. Supp. 493, 496 (S.D.N.Y. 1998); *St. John v. McElroy*, 917 F. Supp. 243, 250 (S.D.N.Y. 1996) (finding the interest in freedom from confinement to be "of the highest constitutional import"). A number of courts have held that section 236(c) of the Act, by denying altogether the possibility of bail and release, violates substantive due process, procedural due process, or both. *See, e.g.*, *Small v. Reno*, 127 F. Supp. 2d 305 (D. Conn. 2000); *United States ex. rel. Radoncic v. Zemski*, 121 F. Supp. 2d 814 (E.D. Pa. 2000); *Chukwuezi v. Reno*, No. CIV. A. 3:CV-99-2020, 2000 WL 1372883 (M.D. Pa. May 16, 2000); *Szeto v. Reno*, No. C 00-0531 CRB, 2000 WL 630869 (N.D. Cal. May 5, 2000); *Danh v. Demore*, 59 F. Supp. 2d 994 (N.D. Cal. 1999); *Van Eeton v. Beebe*, 49 F. Supp. 2d 1186 (D. Or. 1999); *Martinez v. Greene*, 28 F. Supp. 2d 1275 (D. Colo. 1998). *But see, e.g.*, *Parra v. Perryman*, 172 F.3d 954 (7th Cir. 1999); *Lezcano v. Reno*, No. C 99-4894 MJJ, 2000 WL 1175564 (N.D. Cal. Aug. 4, 2000).

Most courts have concluded that, in light of the fundamental interest involved, the highly deferential standard articulated in *Reno v. Flores*, 507 U.S. 292 (1993), is inappropriate here. *See, e.g.*, *Small v. Reno*, *supra*, at 314. Rather,

the standard applicable to pretrial detention, articulated in *United States v. Salerno*, *supra*, should apply. *See Welch v. Reno*, *supra*, at 353-55 (citing *Van Eeton v. Beebe*, s*upra*, at 1189; *Rogowski v. Reno*, No. Civ. 3:99cv790 (PCD), 1999 WL 1702851, at *7 (D. Conn. Oct. 28, 1999); *Martinez v. Greene*, *supra*, at 1278); *see also Grant v. Zemski*, *supra*, at 442.

Many of the decisions that have found constitutional issues to be present have looked to circumstances in which an alien has not conceded deportability and has not yet been ordered removed. "Thus, the possibility of release on bail in this case is not postponing the inevitable." *See Szeto v. Reno*, *supra*, at *4 (citing *Bouayad v. Holmes*, 74 F. Supp. 2d 471 (E.D. Pa. 1999) ("[W]here, as here, a petitioner contests whether he is removable under 8 U.S.C. § 1227, the option of ending detention by departing this country does not cure any constitutional infirmity in the mandatory detention provisions."); *see also Danh v. Demore*, *supra*, at 1002-03 (distinguishing *Parra v. Perryman*, *supra*, on the grounds that petitioners were vigorously challenging their deportability); *Szeto v. Reno*, *supra*, at *4 (same; noting that Parra had conceded the charges).

## III.  CONCLUSION

The stretch of interpretation required by the majority's construction is not supported by the plain language of the statute and is unreasonable. The aliens described in paragraph (1) of section 236(c) of the Act are the ones who are deemed to be inadmissible and deportable for the cited violations and taken into custody when they are released from criminal incarceration. These are the aliens described in paragraph (2) as the ones who may not be released.

The interpretation I reach from a straightforward reading of the plain language of the statute would allow for a hearing when an individual alien, such as this respondent, has already been released into the community, and it would authorize the detention of such individuals where warranted following an individualized hearing. The alternative interpretation I offer is not only the better one as a matter of statutory construction. It also avoids some of the difficult constitutional questions raised by requiring mandatory prehearing detention, without individualized determinations, of people who already have been released into the community. Accordingly, I dissent.